**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

**LAUREL KEENAN-CONIGLIO,**
**CHASE BOND, AUSTIN BUTLER**
**and DYLAN HUTSON,**

      **Plaintiffs,**

**v.**                            **Case No.:** _____

**CUMBRES & TOLTEC SCENIC OPERATING**
**COMMISSION, CUMBRES & TOLTEC OPERATING,**
**LLC, and MARVIN CASIAS, MAX CASIAS and**
**GLENN AVERY, individually,**

      **Defendants.**

---

**PLAINTIFFS' COMPLAINT FOR DAMAGES FOR DISCRIMINATION AND RETALIATION IN VIOLATION OF TITLE VII, FOR VIOLATION OF THE NEW MEXICO WHISTLEBLOWER PROTECTION ACT, AND FOR CIVIL RIGHTS VIOLATIONS UNDER 42 U.S.C. § 1983**

COME NOW Plaintiffs, Laurel Keenan-Coniglio, Chase Bond, Austin Butler and Dylan Hutson, by and through their attorneys, Jerry Todd Wertheim and Carol Clifford, Jones, Snead, Wertheim & Clifford, P.A. and Linda G. Hemphill, The Hemphill Firm, P.C., and hereby submit their Complaint for Damages for Discrimination and Retaliation in Violation of Title VII,  the New Mexico Whistleblower Protection Act and 42 U.S.C. Section 1983 against Defendants, Cumbres & Toltec Scenic Operating Commission,  Cumbres & Toltec Operating, LLC, Marvin Casias, Max Casias and Glenn Avery, individually.

        I.        PARTIES, JURISDICTION AND VENUE

1.      Plaintiffs are all former employees of Defendants. As set forth more fully below, each of them was discriminated against, harassed and subjected to a hostile work environment based on their gender, race or national origin, were subjected to retaliation for complaining about unlawful and discriminatory practices and were either terminated or constructively discharged from employment. They seek redress under Title VII of the Civil Rights Act of 1964, the New Mexico Whistleblower Protection Act, NMSA 1978, Sections 10-16C-1 to 10-16C-6 (the "NMWPA") and 42 U.S.C. Section 1983.

2.      Plaintiff Laurel Keenan-Coniglio ("Keenan-Coniglio") is currently a resident of Valentine, Texas and was at all times material hereto an employee of the Cumbres & Toltec Scenic Railroad ("C & T SRR") owned and operated by Defendants.  The C & T SRR is a tourist train that runs along the former San Juan extension of the Denver and Rio Grande Railroad between Chama, New Mexico and Antonito, Colorado.

3.      Plaintiff, Chase Bond ("Bond") is currently a resident of Keller, Texas and was at all times material hereto an employee of the C & T SRR.

4.      Plaintiff, Austin Butler ("Butler") is currently a resident of Lancaster, Pennsylvania and was at all times material hereto an employee of the C & T SRR.

5.      Plaintiff, Dylan Hutson ("Hutson") is currently a resident of Lancaster, Pennsylvania and was at all times material hereto an employee of the C & T SRR.

6.      The C & T SRR is owned and operated by Defendant Cumbres & Toltec Scenic Railroad Commission (the "Commission"), a public agency created by New Mexico statute to operate and direct the C & T SRR.  The Commission, in turn, does business through Cumbres & Toltec Operating, LLC (the "LLC"), a New Mexico limited liability company with a principal place of business in Chama, New Mexico. The Commission is the sole member of Cumbres &

Toltec Operating, LLC, and its members serve as the Board of Cumbres & Toltec Operating, LLC.  Cumbres & Toltec Operating, LLC issued regular paychecks to all four Plaintiffs during their employment with C & T SRR. According to the Policy and Practices Manual of the C & T SRR, "the Commission remains responsible for all matters of governance and policy" and has delegated to the LLC railroad operations and administrative support. Attachment A, the Policy and Practices Manual of 2017, page. 11. Attachment A, in its entirety, is incorporated by reference as if fully set forth here.

7.      Defendants Commission and LLC operate C & T SRR as a tourist railroad running steam locomotives in revenue passenger service, which is governed by the Federal Railroad Administration under 49 CFR Part 230: Steam Locomotive Inspection and Maintenance Standards. Steam locomotives are governed by these federal standards because their operation can be extremely dangerous if they are not maintained in suitable conditions or are not properly operated.

8.      Defendants Marvin Casias ("Casias"), Max Casias ("Max Casias") and Glenn Avery ("Avery"), at all times material hereto, were supervisors employed by C & T SRR, and are, upon information and belief, residents of Chama, New Mexico.

9.      At all material times, Defendants Commission and LLC met the definition of an employer under Title VII, a public employer under the NMWPA, had 15 or more employees, and acted through their employees and agents, for whose conduct they are responsible under the doctrine of respondeat superior.

10.     All four Plaintiffs meet the definition of an employee under all applicable statutes.

11.     All four Plaintiffs timely filed Charges of Discrimination with the Equal Employment Opportunity Commission and received from EEOC a right-to-sue letter. This action is timely filed within the 90-days of receipt of the right-to-sue letter.

12.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiffs' rights under Title VII and 42 U.S.C. Section 1983.

13.      This Court has supplemental jurisdiction over Plaintiff's state law claims under the NMWPA and should exercise it to hear those claims.

14.      Venue is proper in the district pursuant to 28 U.S.C. § 1391.

## II.     GENERAL ALLEGATIONS

### A. Plaintiff Laurel Keenan-Coniglio

15.     Keenan-Coniglio is a trained carpenter, mechanic and electrician. After doing a volunteer work week session with the Friends of Cumbres & Toltec, a non-profit group, Keenan-Coniglio sought work with C & T SRR on its Operations Team. When she could not get C & T SRR Superintendent Marvin Casias ("Casias") to return her calls, she approached Amy Rector, former Retail and On-Board Manager for C & T SRR, and accepted a position as a parlor car attendant to get her foot in the door.  Although Rector told Keenan-Coniglio that many professional opportunities would be open to her, such as learning to become a fireman or brakeman, Keenan-Coniglio would later learn that there was no way she could be considered for those opportunities as long as Casias was in charge.  During her first month on the job, Engineer Jeff Stebbins called Keenan-Coniglio a "sexually frustrated middle-aged woman," "just like the rest around here."  At the same time, Keenan-Coniglio was subjected to unwanted physical

attention from Engineer Carlos Llamas, who asked her out on dates, hugged her and put his arm around her waist.

16.      Approximately one month later, Keenan-Coniglio heard that C & T SRR needed fire patrol workers and saw it as an opportunity to begin working on the Operations Crew.  Then Fire Patrol Supervisor, Ken Throneberry ("Throneberry"), hired her to work part-time in a fire patrol position, and began training her for that position around August 15, 2021, while she continued to work part-time as a patrol car attendant.

17.      In late August, 2021, Casias announced at a staff meeting attended by former employees Stathi Pappas ("Pappas") and Ken Throneberry ("Throneberry") that he did not want a woman on Fire Patrol and that if there was a woman on the Operations Team, she would have to be either ugly or married.  Around the same time, Keenan-Coniglio witnessed Casias ramming the front of his truck into the rear bumper of Pappas' truck.  She also witnessed another male employee, Lucas Maez ("Maez"), sexually harassing a female employee Laney Zook, asking her what sex acts she could do with her tongue ring to him, in front of a group of people.

18.      When Human Resources Manager Lynn Lemler and Chief of Staff Kim Smith-Casford learned that Keenan-Coniglio was going on to go to work on fire patrol, they demanded that she attend a meeting 100 miles from where she lived in Taos, and when Keenan-Coniglio attended, she was told that she could not hold both jobs, despite having been told by Throneberry that she could do so and learning that another male employee was allowed to work at both in retail and operations simultaneously.  Thereafter, Throneberry and Business Manager, Tomas Campos acknowledged that there were no other fire patrol applicants, that the job needed to be filled and that if they did not allow Keenan-Coniglio to proceed, "it was a lawsuit waiting to happen."

19.     Thereafter, Keenan-Coniglio reported directly to Throneberry in her fire patrol position. Although Throneberry was supportive, Casias, to whom Throneberry reported, ignored her, except to call her "princess" a couple of times.

20.      Keenan-Coniglio was C & T SRR's first female fire patrol member, and the only female operations crew member during the 2021 season.  She worked until the end of the season and got high marks from her performance review by Track Supervisor, John Matthews. Even so, the atmosphere at C & T SRR was racially charged, as Keenan-Coniglio heard employees and supervisors make remarks suggesting that she, as an Anglo woman, was not welcome in the workplace.

21.     In March, 2022, Keenan-Coniglio got paperwork from C & T SRR asking her to return for the 2022 season, and asking what positions she desired, and she responded that she would like to be considered for a brakeman position as well as fire patrol.  When she returned to work, she also tried to gain training that she would need to advance in Operations.  In May, 2022, when she asked Casias, "how do I get to train to be a brakeman," Casias threw up his hands, backed away, and said "it wasn't up to him," although he, in fact, was the Superintendent of the Railroad and oversaw the employee who trained brakemen, Lucas Maez.  A minute later, Throneberry heard Casias say to Keenan-Coniglio and another individual that he was going to "kick their asses," if they didn't do things his way, which Throneberry reported to H.R. Eventually, Throneberry would resign his job in frustration and sue Defendant in New Mexico State Court related to the discrimination, harassment and retaliation he had also endured at C & T SRR.

22.     From the beginning of her work at C & T SRR, Keenan-Coniglio came into a hyper-masculine, unbearable environment that included bullying, physical intimidation, threats

of violence and of the defacement of personal property. This included routine references to male employees as "pussy" and references to female genitalia.  Bond and another co-worker reported to Keenan-Coniglio that Casias, one of his three sons who also worked at C & T SRR, Max Casias ("Max Casias"), and Maez were talking about her in a sexual manner, saying "stay away from her, she's gay and she'll shove something so far up your ass you'll never be able to get it out," and referring to a "big black dildo." Bond and the co-worker also reported that the three men were demeaning Keenan-Coniglio based on her armpit hair.

23.     Keenan-Coniglio came to fear retaliation if she spoke up about what she witnessed and experienced and she feared for her safety. Beyond threats of violence, she had heard references to slashing tires.  Nevertheless, on or about July 13, 2022, just before a scheduled vacation, Keenan-Coniglio, as a courageous and conscientious person, decided she had to overcome her fear and report what was happening to Defendants Human Resources ("H.R.") personnel and sent them an email outlining the discriminatory practices to which she was regularly subjected.

24.     Although Keenan-Coniglio was interviewed by an investigator, Robert Jahn on August 9, 2022, when she later received a draft of her statement, it did not include crucial details about the harassment she had endured and other hostile behavior she witnessed.   Instead of advising Keenan-Coniglio about the results of any investigation by Jahn, C & T SRR put Keenan-Coniglio on administrative leave, depriving her of work and advancement opportunities. When on September 26, 2022, Keenan-Coniglio inquired about the status of Jahn investigation, H.R. advised her that the investigator was "finished" but "hadn't turned in anything yet," which Keenan-Coniglio found curious, since her main witness, Steve Duran, who had resigned around

September 1 after voicing many of the same racist and sexist concerns that she had, had never been contacted.

25.     On October 23, 2022, the last day of the season, Keenan-Coniglio heard from H.R. saying that they found nothing wrong in the course of their investigation and that they were sorry she took comments that were made "the wrong way."  There was no offer to return to work, no promises of protection against retaliation or any statements that would lead Keenan-Coniglio to believe that she was welcome in the workplace or had a future at C & T SRR. Further, in the spring of 2023, Keenan-Coniglio did not receive any offer letter as she had received in the spring of 2022.

26.     Defendants Commission and LLC knew or had reason to know of the unbearable, toxic, and pervasive hostility exhibited by managers and employees of C & T SRR towards female and white employees such as Keenan-Coniglio, based on her complaints and the complaints of others including but not limited to Ken Throneberry, Steven Duran, and Stathi Pappas.

27.     In keeping with Defendants' sexist and racist discriminatory intent, Keenan-Coniglio's shop supervisors denied Keenan-Coniglio opportunities for training and mentoring that would permit her to learn train crew jobs and about the equipment.

28.     The comments and behavior exhibited by Keenan-Coniglio's supervisors and the other trains shop employees arose from Keenan-Coniglio's sex and race and created a pervasive, hostile work environment that no reasonable person could be expected to tolerate.

29.     The conduct described in this complaint was both severe and pervasive, and Keenan-Coniglio never welcomed it. It interfered with the performance of her job duties, denied her opportunity for advancement, promotion and training, subjected her to an intimidating,

hostile and offensive work environment, and ultimately resulted in her discharge or constructive discharge, as no reasonable person could be expected to endure the hostilities to which Keenan-Coniglio was subjected.

### B. PLAINTIFF CHASE BOND

30.     Bond originally worked for C & T SRR from March, 2018 to December, 2018, and left because of on-the-job harassment he experienced, including racial discrimination.  He came back to work for C & T SRR in July, 2021 in as a brakeman and fireman, after being assured by Commissioner/President Scott Gibbs ("Gibbs") that he would not encounter discrimination again, and  because by then, Plaintiffs Goodwin and Hutson had begun working there.  Bond, who had known Goodwin and Hutson previously, was hopeful that the workplace had improved with the presence of Goodwin and Hutson.

31.     For the first two weeks of Bond's employment in 2021, Max Casias, who was the designated Supervisor of Locomotive Engineers, would not speak to him at all; however, after Max Casias did begin communication with Bond, Max Casias made comments that because Bond was white, there would be a race war, as well as making statements that he eventually was going to keep all whites out of locomotive cabs.

32.     By the end of October, 2021, Bond had been assigned to the shop to work under Glenn Avery, who also made racist comments, such as "there are too many white people" working for C & T SRR.  Additionally, Avery warned Bond that he should be "careful who he associated with," making clear that he was referring to Goodwin and Hutson, who he referred to as "faggots."

33.     Bond was concerned not only about the racist and sexist conduct of his supervisors, but also about serious issues of safety that arose in the workplace, including the

following: (a) sometime during the fall of 2021 or winter of 2022, Max Casias engaged in unsafe boiler work on a locomotive and also painted a boiler prior to a visit by the Federal Railway Administration ("FRA") to hide areas of concern on the boiler, such as deep pitting and eroding rivets, making the locomotive potentially subject to an explosion; (b) on January 3, 2022, when employees returned to work after the Christmas break, Superintendent Marvin Casias installed a second lock on the fire exit, making the door unusable as a fire exit and creating a risk for employees to be trapped in the event of a fire; (c) on March 15, 2022, Max Casias instructed only family members and friends of Hispanic descent to put on personal protective equipment because the FRA was making a visit, and purposely excluded white employees from that instruction; (d) on May 10, 2022, Max Casias ignored Bond's hand signals to stop the movement of a train, creating an unsafe condition, and was talking on the phone and looking forward while operating the locomotive in reverse, resulting in the flatcar slamming into a locomotive.  Following that incident, Max Casias appointed Maez to operate one of the locomotives, and Maez repeatedly missed hand-signals due to the fact that he was texting on his cell phone and also was listening to music on ear buds while operative the locomotive.  Bond made safety complaints, verbally, to Gibbs, regarding these and other matters.

34.     Despite being imminently qualified, Bond was not scheduled for a single Locomotive Fireman shift during the 2022 season.  Throughout his employment with the C & T SRR, he faced discrimination which included being called "white boy" by more than one person in the shop or being skipped over for promotions that were given to less qualified Hispanic employees.  Bond was also discriminated against when a job was performed requiring the usage of a respirator, as respirators were supplied to Hispanic employees, but not to Bond.  When Hispanic employees needed filters for their respirators they received them, yet when Bond

needed filters for his respirator, he was told by Max Casias that the paint store was out of them and he would have to wait.  Bond inquired on more than one occasion about the filters, repeatedly received the same response and never received new filters for his respirator.  Bond was also threatened by Marvin Casias on multiple occasions, with Casias stating that he was going to beat Bond with a brake club and shoot his kneecaps out.

35.     After witnessing safety concerns and discriminatory treatment of Keenan-Coniglio, on or about May 23, 2022, Bond filed a complaint with Gibbs, which included the fact that Max Casias had created a highly unsafe, toxic and hostile workplace, that he was showing favoritism towards Hispanic workers and was discriminating against non-Hispanic workers, that he was expressing his hatred of other races and that he was describing how he was prepared to take action against non-Hispanic workers if they engaged in any behaviors of which he did not approve.  Bond also reported how Max Casias, James Garcia and Maez were constantly talking about sexual matters, including talking their sex lives and who got sexually transmitted diseases, sometimes in the presence of Keenan-Coniglio, who they referred to as a "dyke."

36.     On July 4, 2022, Bond witnessed Marvin Casias violating the dictates of the FRA by taping flags to the handrails of a caboose, which obstructed the ability to climb on and off the caboose.  On July 6, 2022, Max Casias was again operating a locomotive while taking on his cell phone and ignoring hand-signals, during which time Bond was attempting to training a student brakeman.  Max Casias' conduct could easily have resulted in customers in the vicinity being run over due to his not paying attention.  In the days following that incident, concerned that Gibbs had not acted on his verbal reports and his May 23, 2022 complaint, Bond also filed a report with both the Environmental Protection Agency and OSHA, detailing unsafe practices he had observed.

Complaint Page 11

37.     On July 25, 2022, Bond participated in an investigation conducted by Robert Caswell Investigations in Albuquerque pertaining to his May 23, 2022 complaint, which Bond later learned had concluded that there "was not enough evidence" of the matters about which Bond had complained.  After Max Casias learned of Bond's complaint, his behavior towards Bond escalated.

38.      On September 19, 2022, Bond submitted a statement to Robert Jahn, the investigator assigned to handle the complaint filed by Keenan-Coniglio.  In his statement, Bond corroborated Keenan-Coniglio's complaints and also stated that he, too, had been subjected to sexual harassment at the Antonito, Colorado shop on a daily basis.  This harassment included conduct by Max Casias from November 2021 to May 2022 in which he would push another employee, James Garcia, to tell Bond that he was going to shove his "cock" down Bond's girlfriend's throat and make her "gargle" his semen.  Whenever James Garcia was gone from work, Max Casias and Marvin Casias would tell Bond throughout the day that James Garcia was at Bond's house "f--king" my girlfriend and making sure that Bond would have "brown kids," also stating that James Garcia couldn't wait to leave work before me and "eat his girlfriend's pussy" and "f--k her brains out" before Bond would get home. The two Casias's would then tell Bond that after his girlfriend became pregnant and delivered, he would notice that the child born wasn't his.  On one occasion, Max Casias stuck his finger between Bond's buttocks while he was climbing into the firebox door of locomotive 315, laughing about it with his friends.  Lastly, Bond noted in his September 19, 2022 statement, Gibbs had been made aware of many of these issues and had continued to ignore these concerns.

39.     On or about October 21, 2022, Bond made an official report to the FRA about these matters.  Two days later, on October 23, 2022, Bond was fired for allegedly committing

time-card fraud. Although Bond attempted to explain to H.R. how he had not committed time-card fraud, he was summarily silenced. Because actual time card fraud was rampant at C & T SRR, including management allowing Hispanic employees to drive to the grocery store, their homes, and friends' homes during morning break without clocking out, Bond's termination was pre-textual, clearly discriminatory and in retaliation for his having reported the unsafe, hostile and discriminatory practices outlined above.

C.  PLAINTIFF AUSTIN BUTLER

40.    Butler was hired by C & T SRR in May, 2018 and worked until his constructive discharge on or about November 28, 2022.  Butler began employment as a locomotive mechanic, then worked as a fireman and eventually as shop foreman. Butler initially reported to Shop Manager, Defendant Avery, but also kept in close touch with Gibbs.

41.    Almost from the outset of his employment, Butler could see that the staff had evolved a set of unsafe guidelines in maintaining steam engines/locomotives and were not following the Code of Federal Regulations governing the railroad, 49 CFR 230, which was designed to protect the safety of both consumers and workers. Butler intervened multiple times when he observed and reported safety issues, both verbally and in writing, to Gibbs.

42.    Also from the outset of his employment, Butler was subjected to an anti-white racist culture. Within the first month of his initial hire, Butler and non-Hispanic workers were subjected to racial slurs on a regular basis, including being called "white boy," "white boy faggot," "gringo," and "guero." These slurs were regularly used by C & T SRR managers, including Donald Martinez, who acted as the Chama Shop Foreman in 2018, Tom Garcia, Martinez's successor in 2019-2020, and Avery, who was the Chama Shop Manager from the time of Butler's hire until Butler resigned in 2022, and set the stage for subordinate employees to join in the racist taunts.

Complaint Page 13

43.     The anti-white culture at C & T SRR included Avery prohibiting Butler from disciplining the Hispanic employees Butler supervised who regularly violated federal railroad safety regulations.  Additionally, Butler was not permitted to hire workers who had the fabrication skills and knowledge needed for the job if they were non-Hispanic.  Although Butler brought concerns to Gibbs that there were many instances where Hispanic employees were violating federal railroad regulations, he was still not permitted to discipline them.  Butler was also not allowed to hire workers who had fabrication skills and knowledge if the candidate for employment was white.

44.     In addition to fostering a racially discriminatory environment, C & T SRR also permitted supervisors to create a sexually divisive work environment, with Avery at the forefront in telling sexual jokes and comments on a regular basis, which caused at least one talented female shop employee, Melinda Keith, to resign her employment.

45.     On or about March 7, 2022, Butler, along with Hutson, confronted Gibbs over the quality of boiler repair work being done on the Antonito side of the railroad. He brought to the attention of both Avery and Gibbs that Max Casias was using a noncompliant boiler welding procedure on locomotive 315 in violation of the repair standards outlined by the applicable Code of Federal Regulations s. Butler's had the good faith belief, based upon pictures he was sent by Bond, who was assisting on the project, that the welds in the area that was being worked on were poor and had a high likelihood of failure, potentially injuring the crew of the locomotive or passengers riding behind the engine. Butler knew the poor quality of Max Casias's work and was concerned that what he had seen in the pictures would be covered up with more weld until it could be ground down and hidden to pass federal inspection, in violation of national standards.

46.     When Butler reported the matter to Gibbs, he sought and was provided assurances by Gibbs that his report would be anonymous, because Butler knew that if Max Casias found out that Butler had reported him, he would bar Butler's promotion to engineer. Later on, Butler discovered that Max Casias was, in fact, told about Butler's report and Max Casias did, in fact, bar Butler's promotion, despite the fact that Butler was imminently qualified for the promotion by having earned perfect scores on all engineman tests and demonstrated outstanding performance in his duties as a fireman and student engineer for several years.

47.     On or about May 30, 2022, Butler was given the position of Chama Shop Foreman as the prior foreman had quit and several new hires were expected.  For the entirety of the railroad's 52 years of existence, there had been no training manual for new hires to brief themselves on the operation of steam locomotives, and Gibbs asked that Hutson, with Butler's assistance, create one.  After he did so, however, Avery refused to implement the training and Butler was asked to step in because Avery could or would not handle the foreman and manager positions.

48.     On or about June 30, 2022, Butler was unofficially transferred out of the mechanical shop into the operations department as a fireman, working under Max Casias, to train employees on how to operate a new type of firing method on a recently retrofitted locomotive.

49.     Max Casias also had a double standard for Hispanic and Non-Hispanic employees.  Any time a schedule change needed to be made, Max Casias made sure that Hispanic employees got the better deal, resulting in Butler's losing five shifts in a two-month period.  Although Hispanic employees supervised by Max Casias regularly broke federal and company cell phone policy with online posts of operating the locomotives, the C & T SRR smoking policy and posted railroad speed restrictions, there was no discipline imposed.

Complaint Page 15

50.     Following his unofficial transfer to operations, Butler was rarely given more than one full day per week doing mechanical work in the shop and was officially given only one student, Harry Haas ("Haas"), who Max Casias made clear he wanted pushed out.  At that time, Butler learned from two Antonito employees that Max Casias stated that he did not want any whites in the cabs of the locomotives and only wanted his close friends and family who are Hispanic. In furtherance of his plan, Max Casias instructed Butler to be as hard on Harry as he could so he would not want to return the following season.

51.     On the morning of Hass's first day of training, Max Casias called Butler and informed him that if he pushed Hass out and made him quit, he would get his shifts as an engineman.  Butler refused to comply with this plan, because he found Hass to be entirely competent and to have passed applicable tests.

52.     After that, Butler was unofficially assigned two white students, who were denied the opportunity to take skills tests, while simultaneously being denied the opportunity to work with Hispanic students, who were assigned Hispanic supervisors and given opportunities to success.  This segregation of students was yet another example of the racially divisive environment to which Butler and other non-Hispanics were subjected on a daily basis.

53.     During the summer of 2022, Butler brought a number of safety issues to Gibbs' attention, including:  (a) On July 1, 2022, Butler informed Gibbs that the work done on Locomotive 484, supervised by Max Casias and his father, Marvin Casias, was sub-par and had cost the railroad approximately $10,200 in wasted wages and materials; (b) On July 27, 2022, when an eastbound train hit a rock at milepost 304, Butler stated that the crew would need to undergo drug tests in compliance with CFR 219.203 due to damage being done to the locomotive while passengers occupied the train behind them; (c) On August 4, 2022 locomotive 484,

operated by Gibbs and Max Casias, left the Chama yard limits without any functioning interior

lights, in violation of CFR 230.87 that states all cab lights must be functional; (d)  On August 14,

2022 Butler wrote a long list of repairs needed on Locomotive 484 and instructed Desi

Manzanares ("Manzanares") that there were several critical items on the report that needed to be

addressed before the engine was to go out again. When Butler confronted Manzanares about the

repair form having been tossed aside, he and Manuel Torrez denied not having made the repairs

but it was clear that they had not been done; (e) On August 19, 2022, Butler reported Marvin

Casias to the FRA for operating locomotive 488 in the Chama yard while talking on his cell

phone; and (f) On September 6, 2022, Butler reported Manzanares to Gibbs for destroying a blue

flag over a dispute with two white employees who were apparently working slower than

Manzanares cared for.  When Manzanares returned from a smoke break and discovered their

progress, he descended into a fit of rage, tossing the blue flag like a javelin across the shop and

snapping it, precluding the locomotive leaving that night from being fitted with a blue flag,

despite having had work necessitating a blue flag to protect employees working on the

equipment, in violation of  CFR 218.21; and (g) Butler also became aware of and reported eleven

different undeniable CFR or national boiler standard violations. To Butler's knowledge,

management at C & T SRR did nothing to address these specific and systemic issues.

54.     In July, 2022, Butler became involved in Bond's May 23, 2022 discrimination

complaint against Max Casias and gave a statement to an investigator supporting Bond's

complaint.  Following his participation, hostilities between himself and Max Casias, which were

already at a boiling point, increased.

55.     In August, 2022, Butler reported to H.R. that another shop employee, Desi

Manzanares ("Manzanares"), who had a close friendship with Avery and Max Casias, had

threatened him with violence, stating that he would "kick [Butler's] ass," after Butler confronted

him about a performance issue.  Because Manzanares had already been arrested for assault in

April, 2022, Butler viewed his threats as extremely concerning.

56.     Although Hispanic employees regularly received a pass when it came to

violations of company policies, in September, 2022, Butler himself was suspended for having

spoken negatively about the company. The sum total of what Butler had done was to respond to a

student's question about a locomotive in trouble, "are they going to fix [the problem]," to which

Butler stated "probably not," out of frustration for the lack of adherence to safety standards.

57.     In keeping with C & T SRR's policy of disciplining only non-Hispanic

employees, on or about September 11, 2022, Haas was suspended for two weeks for hitting a

rock two months' prior. The suspension was delivered following several instances of Hass

having submitted Form No. 2 reports to Gibbs (President) showing repeated mechanical issues

with locomotives that had not been addressed for weeks by Max Casias and Avery.

58.     Butler subsequently learned that he was under investigation for racial

discrimination, based on the fact that he had assigned Hispanic employees to do some unskilled

jobs.  To his knowledge, the only employees interviewed in any investigation were Hispanic,

with one possible exception.  None of the non-Hispanic employees under Butler's supervision

were interviewed. Apparently as a result of the investigation, on September 20, 2022, as Butler

got off the engine after a day's shift as a fireman, he was informed by Gibbs that he would no

longer be working in the Chama locomotive shop under Avery and was transferred into

operations full time. By having raised the issues of Manzanares' and Torrez's failure to make

repairs, no longer was on speaking terms with Avery, who regularly yelled and screamed

obscenities at and about Butler.

59.     On September 25, 2022, Butler then presented Gibbs with a pile of eighteen different form no. 2s that spanned through the end of August 2022 which Butler had found left on the clipboard in his assigned locomotive when going to sign the form no. 2 for the day's morning inspection. With the forms still being on the locomotive, it was clear that they had not even been looked at, let alone addressed as not a single form had a signature on it. Gibbs took the forms and made copies of them to present to Casias.

60.     Although Butler was repeatedly told by H.R. after his report that it would address the threats made by Manzanares to Butler and investigate, it never did so, even though following his threats to Butler, Manzanares had committed other infractions, including the incident where he flew into a rage over the two new employees who failed to meet his time expectations and destroyed company property, and had reportedly failed a drug test.  In mid-October, 2022, H.R. representative Roseann Talamante ("Talamante") told Butler that although she was still gathering information, she had spoken to Manzanares about his statements, but defended Manzanares by saying "that is just how Desi talks when he is upset."

61.     On October 22, 2022, Butler informed Talamante that he would not be available for the shift he was assigned in an impromptu schedule change and would be using all of his accrued PTO to return to work in November.

62.     The next day, both Bond and Hutson, employees and friends Butler had depended upon to accomplish skilled work, were wrongfully fired for time-card fraud over time discrepancies with FRA hours of service and the company time clock, which Butler believed was a pretext for discrimination and retaliation, as both had also repeatedly made complaints about discrimination and safety concerns.

Complaint Page 19

63.     With Hutson and Bond having been fired, Butler had no one to depend upon at the railroad who could do skilled labor. Faced with a grim future of working with employees who have no regard for CFR compliance, habitually put out poor quality work and discriminated on a regular basis against non-Hispanic employees and women, Butler informed Gibbs that he would not continue to work in a hostile environment and on or about November 28, 2022, Butler was constructively discharged from his employment because no reasonable person could be expected to continue to endure the work environment to which he had been subjected.

### D. PLAINTIFF DYLAN HUTSON

64.     Hutson began employment at C & T SRR in May, 2017 and worked there five and a half years, until he and Bond were both wrongfully terminated in November, 2022 after being falsely accused of time card fraud.  Defendants subjected Hutson, like the other three Plaintiffs, to systematic discrimination throughout his tenure at C & T SRR, and after he reported discrimination and safety concerns, he was retaliated against for his reporting.

65.     Mr. Hutson was originally hired as a seasonal employee, then full-time in the fall of 2017, first working as a machinist, mechanic, fireman, hostler, then as a student engineer.

66.     Beginning in 2017, Hutson was subjected to racial slurs, including "white boy" and the term "güero" which is derogatory slang, similar to the word "gringo", to describe persons of Caucasian descent. Chama Shop Foreman Donald Martinez was the first supervisor to verbally abuse Hutson based on his race throughout 2017 and 2018. Martinez would talk about how he preferred "Spanish people" working at the railroad.  He would also refer to Hutson as the "f--kin' white guy" who "doesn't know a f--kin' thing."

67.     Hutson also faced the same racial discrimination and harassment from his supervisors, Avery and Max Casias.  Avery was his direct supervisor and became hostile towards

Hutson once Hutson began working closely with then Vice President Stathi Pappas ("Pappas"), also non-Hispanic, on certain mechanical projects.  In fact, Avery admitted to Hutson in confidence during a private discussion that he was racially prejudiced, and on at least one occasion, Avery lost his temper with Hutson, shouting and cursing at him in a furious rage.

68.     During the course of his employment with C & T SRR, Hutson raised safety and compliance concerns to the attention of Gibbs, including the following:  (a) On September 26, 2021, Avery, attempted to coerce Hutson into fraudulently signing a 31-Day Inspection Form after the mandatory work had not been done to inspect the water glass fittings for scale buildup on locomotive 487, required by 49 CFR Parts 230.14 and 230.53. Hutson refused to sign the form and extinguished the coal fire that had been built up inside the locomotive's boiler because he knew the work had not been done to complete the minimum requirements, seriously delaying a revenue train the following day, to the consternation of Avery; (b) On March 7, 2022, Hutson (along with Goodwin) brought to the attention of both Avery and Gibbs that a noncompliant boiler welding procedure was being conducted on locomotive 315 in violation of the repair standards outlined by the applicable Code of Federal Regulations sections; (c)  On May 20, 2022, Hutson brought to the attention of both Gibbs and Avery that locomotive 488 had not received its five-year Inspection as required by 49 CFR Part 230.16; (d) On August 14, 2022, Hutson arrived at work as a scheduled train crew member in Antonito, Colorado and began conducting his morning inspection of locomotive 463, but soon discovered that the right hand side #2 driving wheel leaf spring was broken at the making the engine illegal for service, this time to the consternation of Casias; (e) On August 25, 2022 locomotive 488 experienced a bearing failure in revenue service that led to one of the driving axles being severely overheated and damaged, which required the department to remove the locomotive from service and extract

the wheelset. Following an investigation by Hutson and Goodwin, they determined that the cause of the overheated bearing was due to another shop employee having failed to adhere to a standard practice that had been adopted several years prior on Hutson's recommendation. When the issue was addressed with Avery, he rejected the findings, falsely maintaining that the bearing had failed for another reason entirely; (f) in August or September of 2022, Hutson was a crew member on locomotive 484. Upon arriving in Chama at the end of the shift, he reported to the shop crew that the drain valve for the water column on locomotive 484 was not closing properly and that the locomotive needed to be removed from service and bled of its steam pressure so this repair could be performed at once because the defect could cause the water glass to display a false reading; (g) On September 11, 2022, Hutson told Gibbs that a train service employee had conducted an unsafe move, allowing a locomotive and train to pull ahead without surveying the surroundings of the consist. Because a sewage drain hose had been attached to one of the cars and it broke apart, raw sewage was spewed about the area in front of the station.  These matters were all reported to management.

69.     During the week of September 12, 2022, Hutson and Goodwin held a call with the company's regional FRA safety inspector, Mike Smith ("Smith"). Smith was informed of their beliefs that unsafe and noncompliant practices were occurring at the C&TSRR, and they agreed to follow up with him at a later date. Smith visited the property later in the year to conduct inspections.

70.     Recognizing that Avery was a problem, Gibbs had, confidentially, asked both Goodwin and Hutson to submit a plan for reorganizing the department and to develop a training manual to cover relevant topics including general railroad safety and steam locomotive practices. Although Hutson created the manual, Avery was unwilling to allow new hires to be trained with

the manual by Hutson. Although both Hutson and Goodwin had both expressed to Gibbs that Avery was unfit emotionally and underqualified professionally to be in charge of the locomotive shop, Gibbs did nothing to rectify the situation.

71.     Hutson was a model employee, who dedicated himself to the safe and successful operation of the railroad. By 2022, he had become a skilled manual machinist and fabricator, and a promising student engineer.

72.     Defendants manufactured the claim of time-card fraud to terminate Hutson. He had not committed time fraud, but the C & T SRR used it as a pretext to deny him a promotion and to retaliate for him raising safety and discrimination issues.

73.      Having been in the engineer training program for about two and a half seasons at the time of his termination, Hutson should have had the opportunity to take the third and final of the three sections of engineer tests. Hutson and Goodwin scored 100% on the second test late in the fall of 2021 and Max Casias then said he would give to us the study material for the third test early in 2022. Neither of us were ever issued the study material, and throughout the entire 2022 season Max Casias never once scheduled an in train service in order to provide on-the-job training, or evaluate Hutson's performance/progress as a student engineer. As a result of Hutson blowing the whistle on the locomotive 315 boiler issue, d Max Casias had to cut out his old welds and then work alongside a hired contractor to redo the work. Not only did this cause Max Casias to experience toil and embarrassment,  it also had a financial effect, ultimately devastating the budget of the project by costing the Durango Rail Historical Society (DRHS) tens of thousands of dollars to redo the work.

74.     Max Casias repeatedly and continually belittled and trash-talked Hutson behind his back to other employees. At one point, upon seeing Hutson's initials stamped into a part

Hutson had manufactured, Max Casias angrily expressed to Bond how much he hated Hutson. Max Casias was Hutson's direct supervisor during shifts when he was employed in engine service. It is no coincidence that Hutson and Bond were both fired on the same day for the same specious reasons.

75.     After Hutson participated in the investigation of Bond's discrimination complaints against Max Casias in July, 2022, Max Casias mostly ignored Hutson, even though he was one of Hutson's supervisors.  Max Casias also expressed racial bias against Hutson.

76.     Because Hutson is Caucasian, even though he was told he scored 100% on the second of three sections of the written engineer's test in the fall of 2021, and was told he would be given the third section of the test in 2022, Max Casias never provided any further training material for the engineer training program, nor did he ever schedule Hutson on the locomotive for hands-on training throughout the 2022 season. It was clear to Hutson and others that Max Casias was making sure that there would not be any more white engineers at the railroad, even though Hutson had been promised a promotion to engineer.

77.     Max Casias did, however, begin scheduling himself on a frequent basis with other, less experienced Hispanic employees, teaching them how to run the locomotives, even though Hutson had seniority in the program and was listed in the 2021 C & T SSR Engineman's Manual as one of the two student engineers at the time.

78.     After having participated in an investigation for racially motivated harassment against Max Casias in July 2022, Hutson was denied promotion to train service engineer and then fired on October 23, 2022, the last day of train operations for the 2022 tourist season. Hutson was fired without any previous form of discipline, warning, or notice.

COUNT I: VIOLATION OF TITLE VII: DISCRIMINATION

Complaint Page 24

79.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

80.     At all relevant times Plaintiffs were "employees" within the meaning of Title VII, and Defendants were "employers" within the meaning of Title VII.

81.     As outlined above, Defendants Commission and LLC violated Title VII when they discriminated against Plaintiffs by actually or constructively discharging them, and denying them promotions or reemployment because of gender and/or race.

82.     As a direct and proximate result of  the discriminatory conduct by Defendants Commission and LLC in violation of Title VII, Plaintiffs have suffered, and continue to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income ("back pay" and "front pay"), compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem, reputation and self-confidence, and emotional pain and suffering, for which Plaintiffs are entitled to an award of compensatory damages, reasonable attorney's fees, costs and pre- and post-judgment interest.

COUNT II: VIOLATION OF TITLE VII: HARASSMENT

83.      Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

84.     As outlined above, Defendants Commission and LLC violated Title VII when they subjected Plaintiffs to harassment and a hostile work environment because of Plaintiffs' gender and race.

85.     Defendants Commission and LLC are liable for the harassment of Keenan-Coniglio during the course of her employment because C & T SRR had no effective anti-

harassment policy, because she reported her concerns to these Defendants and these Defendants failed to take prompt remedial action, and because supervisors participated in the severe and pervasive harassment based on protective classifications, making these Defendants strictly liable for supervisory actions.

86.     As a direct and proximate result of these Defendants' harassing conduct in violation of Title VII, Plaintiffs have suffered, and continues to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income ( "back pay" and "front pay"), compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem, reputation and self-confidence, and emotional pain and suffering, for which Plaintiffs are entitled to an award of compensatory damages, reasonable attorney's fees, and costs, pre- and post-judgment interest, in an amount to be determined at trial.

## COUNT III: TITLE VII RETALIATION

87.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

88.     As outlined above, Defendants Commission and LLC violated Title VII when they retaliated against Plaintiffs by actually or constructively discharging them, as well as denied reemployment, because Plaintiffs engaged in activity protected by Title VII in reporting the discriminatory, harassing, sexist and racist actions at C & T SRR.

89.     Defendants Commission and LLC terminated, constructively discharged, denied reemployment and promotion, and created a hostile work environment for Plaintiffs because they opposed practices made unlawful by Title VII, including but not limited to discrimination because of sex and race, and the race of others, in violation of 42 U.S.C. § 2000e-3(a).

90.     As a direct and proximate result of these Defendants' retaliatory conduct in violation of Title VII, Plaintiffs have suffered, and will continue to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income ("back pay" and "front pay"), compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem, reputation and self-confidence, and emotional pain and suffering, for which Plaintiffs are entitled to an award of compensatory damages, reasonable attorney's fees and costs, and pre- and post-judgment interest in an amount to be determined at trial.

COUNT IV: VIOLATION OF THE NEW MEXICO WHISTLEBLOWER PROTECTION ACT

91.     Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

92.     The Cumbres and Toltec Scenic Railroad Commission is a public commission of the State of New Mexico, created by the Cumbres and Toltec Scenic Railroad Act. Defendants Commission and LLC are thus public employers within the meaning of the Whistleblower Protection Act. NMSA 1978, Section 10-16C-3.

93.     Plaintiffs engaged in protected activity within the meaning of the New Mexico Whistleblower Protection Act, including but not limited to the following:

     a.  By opposing discriminatory conduct of supervisors and other railroad employees to the public employer that amounted to violation of Title VII and the New Mexico Human Rights Act.

     b.  By opposing conduct of supervisors and other railroad employees to the public employer that amounted to violation of the policies of the public employer, including but not limited to violations of the Employee Manual of the C & T SRR.

c.   By raising safety concerns related to the operators of C & T SRR and federal regulators, including Federal Railway Safety Act administrators, citing violations of OSHA regulations and other applicable safety statutes and regulations.

94.   Such conduct constitutes protected activity under NMSA 1978, Section 10-16C-3.

95.   Defendants Commission and LLC retaliated against Plaintiffs because they had reported, in good faith, their good faith beliefs regarding illegal, unethical and improper behavior, or because they had refused to participate in or tolerate practices they believed in good faith constituted unlawful or improper acts, or both, resulting in retaliation against Plaintiffs which included actual and constructive discharge, denial of promotion and other opportunities and creating a hostile work environment for Plaintiffs.

96.   As a direct and proximate result of these Defendants' retaliatory conduct in violation of the NMWPA, Plaintiffs have suffered, and will continue to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income ("back pay" and "front pay"), compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem, reputation and self-confidence, and emotional pain and suffering, for which Plaintiffs are entitled to an award of compensatory damages, including double back pay plus interest as specified in the NMWPA,  reasonable attorney's fees and costs, and pre- and post-judgment interest in an amount to be determined at trial.

COUNT V: VIOLATION OF 42 U.S.C. SECTION 1983

97.   Plaintiffs allege and incorporate by reference the allegations in the preceding paragraphs.

98.     Plaintiffs brings their claims against Casias, Max Casias and Avery, individually, pursuant to 42 U.S.C. §1983 seeking redress for violation of Plaintiffs' constitutional right to equal protection protected by the Fourteenth Amendment, which protects the rights of Plaintiffs to be free from discrimination and harassment based on their race and/or gender and from retaliation due to their complaints about racial and gender discrimination.

99.     Casias, Max Casias and Avery acted under color of state law to deprive Plaintiffs of their constitutional rights when they harassed, discriminated against, created a hostile work environment for and retaliated against Plaintiffs, as described more particularly above.

100.    The contours of Plaintiffs' constitutional rights to equal protection of the law and the right to be free from discrimination, harassment and retaliation at the time that the individual defendants took action against them, and the contours of these rights were sufficiently clear that a reasonable official would understand that what he or she was doing violated that right.

101.    As a direct and proximate result of these Defendants' retaliatory conduct in violation of 42 U.S.C. Section 1983, Plaintiffs have suffered, and will continue to suffer, monetary and/or economic damages, including, but not limited to, loss of past and future income ("back pay" and "front pay"), compensation, and benefits, as well severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress, anxiety, loss of self-esteem, reputation and self-confidence, and emotional pain and suffering, for which Plaintiffs are entitled to an award of compensatory damages.

102.    Casias, Max Casias and Avery acted knowingly, recklessly or with deliberate indifference to and in callous disregard of the rights of Plaintiffs, entitling Plaintiffs to an award of punitive damages under 42 U.S.C. Section 1983.

103.    Plaintiffs are also entitled to pre-judgment interest, reasonable attorney's fees and costs pursuant to 42 U.S.C. §1988.

R<small>ELIEF</small> R<small>EQUESTED</small>

WHEREFORE, Plaintiffs pray for judgment against Defendants, after a trial by jury, as follows:

a.      Judgment be entered against all Defendants for compensatory damages, including permissible past and future lost wages, damages for emotional distress and special damages as permitted under Title VII, the NMWPA and 42 U.S.C. Section 1983;

b.      Judgment be entered requiring the Commission and LLC to pay Plaintiffs an amount equal to two times the amount of Plaintiffs' back pay, plus interest under the NMWPA;

c.      Judgment be entered requiring the individual Defendants to pay punitive damages based on violation of 42 U.S.C. Section 1983; and

d.      Judgment be entered requiring Defendants to pay attorney's fees, costs, pre-judgment and post-judgment interest as allowed by all applicable statutes.

Respectfully submitted,

THE HEMPHILL FIRM, P.C.

By: Linda G. Hemphill, Esq.
Linda G. Hemphill
P.O. Box 33136
Santa Fe, New Mexico 87594
(505) 986-8515

and

JONES, SNEAD, WERTHEIM & CLIFFORD, P.A.

By: Jerry Todd Wertheim, Esq.

Jerry Todd Wertheim, Esq.
141 E. Palace Ave., Suite 220
Santa Fe, New Mexico 87501
(505) 982-0011

Attorneys for Plaintiffs