## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

LAUREL KEENAN-CONIGLIO,
CHASE BOND, AUSTIN GOODWIN
and DYLAN HUTSON,

       Plaintiffs,

                                        No. 1:23-cv-01051-WJ-KK

   v.

CUMBRES & TOLTEC SCENIC OPERATING
COMMISSION, CUMBRES & TOLTEC
OPERATING, LLC and MARVIN CASIAS,
MAX CASIAS, GLENN AVERY, and SCOTT
GIBBS, individually,

       Defendants.

### MEMORANDUM OPINION AND ORDER
### GRANTING IN PART and DENYING IN PART
### ENTITY DEFENDANTS' MOTION TO DISMISS and
### GRANTING INDIVIDUAL DEFENDANTS' MOTION TO DISMISS

**THIS MATTER** is before the Court on Defendants' Cumbres & Toltec Railroad

Commission and Cumbres Toltec Operating, LLC ("Cumbres Defendants")[1] Motion to Dismiss

(**Doc. 15**) as well as the individual Defendants' Motion to Dismiss (**Doc. 16**). Having reviewed the

parties' pleadings (as well as the additional briefing)[2] and considered the applicable law, the Court

---

[1] The Court uses the entities' correct names here—but leaves the caption as stylized on the case management electronic filing system.

      According to the Cumbres Defendants, the Commission is "incorrectly named as 'Cumbres & Toltec Scenic Operating Commission.'" **Doc. 15 at 1**. At times, Plaintiffs abbreviate the Commission as "C&TSRR." *See* **Doc. 5,** *passim*. Likewise, the LLC is "Cumbres Toltec Operating, LLC," not "Cumbres & Toltec Operating, LLC." **Doc. 15 at 1**.

[2] On October 17, 2024, the Court filed an Order requiring the parties to brief a few overlooked points. *See* **Doc. 34**. Both parties responded, as required (**Docs. 43 & 44**). The Court considered those filings, as well as the original Responses (**Docs. 25 & 28**) and Replies (**Docs. 40 & 41**) to the motions to dismiss.

**GRANTS in part** and **DENIES in part** the Cumbres Defendants' Motion (**Doc. 15**). The Court also **GRANTS** the individual Defendants' Motion to Dismiss (**Doc. 16**), as to Count V.

Specifically, as for the Cumbres Defendants' Motion to Dismiss (**Doc. 15**), the Court dismisses Plaintiffs' claims in Counts I, IV, and VI. The Court also dismisses Counts II–III with respect to Plaintiffs Bond, Goodwin, and Hutson. Plaintiff Keenan-Coniglio's Title VII claims based on race are, likewise, dismissed. Her gender/sex-based harassment and hostile work environment claim in Count II, however, may proceed.

## BACKGROUND

On November 22, 2023, Plaintiffs Laurel Keenan-Coniglio, Chase Bond, Austin Butler, and Dylan Hutson ("Plaintiffs"), filed a Complaint (**Doc. 1**) alleging violations under Title VII, the New Mexico Whistleblower Protection Act ("NMWPA"), and 42 U.S.C. § 1983. According to Plaintiffs' Complaint, the Cumbres Defendants fostered a sexist and racist workplace.

Plaintiffs then filed a First Amended Complaint ("FAC") on December 14, 2023 (**Doc. 5**). Count I alleges discrimination under Title VII; Count II alleges hostile work environment harassment under Title VII; Count III alleges retaliation under Title VII; Count IV alleges a violation of the NMWPA; and Counts V and VI allege causes of action under § 1983. Counts I–IV and VI are levied against the Cumbres Defendants; whereas Count V alleges a violation of § 1983 by the individually named Defendants. *Id.* **at 28–29**.

* * *

Some additional background about the parties is helpful.

The scenic railroad operates through a limited liability company ("LLC"), known as the Cumbres Toltec Operating, LLC. This LLC is a wholly owned subsidiary of the Cumbres & Toltec Railroad Commission. The Commission is an interstate agency—established by Compact between

New Mexico and Colorado (with Congressional consent). *See* Pub. L. No. 93-467, 88 Stat. 1421 (1974). The Commission is the LLC's governing body.

The four Plaintiffs are former employees of the scenic railroad. *Compare* **Doc. 5 at ¶ 1**, *with* **Doc. 15 at 5**. Each was paid by and worked for the LLC (**Doc. 5 at ¶ 7**), and none were members of the Commission (**Doc. 43-1 at 4**).

## LEGAL STANDARDS

The Cumbres Defendants seek dismissal under Fed. R. Civ. P. 12(b)(1), (6), and (7). *See* **Doc. 15 at 1**. As such, the Court first outlines the legal standards for: (1) lack of subject-matter jurisdiction, (2) failure to state a claim upon which relief can be granted, and (3) failure to join a party. The Court then outlines the state action doctrine (and its applicable tests). After establishing the appropriate legal framework, the Court moves to its analysis.

## I. Motion to Dismiss Legal Standards

### A. Rule 12(b)(1) Standard

Rule 12(b)(1) empowers a court to dismiss a complaint for lack of jurisdiction over the subject matter. When ruling on a Rule 12(b)(1) motion, a court has broad discretion to consider affidavits, an administrative record, or other documents necessary to resolve disputed jurisdictional facts. *Holt v. United States*, 46 F.3d 1000, 1003 (10th Cir. 1995).

Here, the Cumbres Defendants allege the Court does not have subject matter jurisdiction over Count VI—alleging a violation of § 1983 against the Commission—because of sovereign immunity (**Doc. 15 at 16–20**). A motion to dismiss based on sovereign immunity "is treated as a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1)." *Neiberger v. Hawkins*, 150 F. Supp. 2d 1118, 1120 (D. Colo. 2001); *see Gaines v. Pearson*, 516 F. App'x 724

(10th Cir. 2013) (unpublished) (reviewing a district court's Rule 12(b)(1) dismissal for lack of jurisdiction based on Eleventh Amendment immunity).

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend XI.

Eleventh Amendment immunity is "a fundamental aspect of the sovereignty" which the many States enjoy. *Alden v. Maine*, 527 U.S. 706, 713 (1999). No doubt, "[s]overeign immunity precludes federal court jurisdiction." *Garling v. EPA*, 849 F.3d 1289, 1294 (10th Cir. 2017) (citing *FDIC v. Meyer*, 510 U.S. 471, 475 (1994)). Defendants argue they are an arm of the States—meaning the real parties in interest are the States (**Doc. 15 at 16–21**). *See Mt. Healthy City Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (extending sovereign immunity to state agencies functioning as an arm of the state); *see also Callahan v. Poppell*, 471 F.3d 1155, 1158 (10th Cir. 2006). Absent a waiver of sovereign immunity, the Eleventh Amendment shields States (and State officials). *Ross. v. Bd. of Regents of Univ. of N.M.*, 599 F.3d 1114, 1117 (10th Cir. 1998).

There is no doubt that Colorado and New Mexico are immune from suit here under the Eleventh Amendment. *See Schrader v. New Mexico*, 361 F. App'x 971, 974 (10th Cir. 2010) (unpublished) ("In enacting § 1983, Congress did not abrogate New Mexico's sovereign immunity."); *Murray v. Colorado*, 149 F. App'x 772, 774 (10th Cir. 2005) (unpublished) ("We therefore hold that the State of Colorado is immune from suit under the Eleventh Amendment."). But New Mexico and Colorado are not parties in this case, so the question here is: Are the Cumbres Defendants an arm of the States such that they are immune from suit under the Eleventh Amendment?

4

### B. Rule 12(b)(6) Standard[3]

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is plausible when the complaint contains "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "When assessing plausibility, a plaintiff's allegations are 'read in the context of the entire complaint.'" *Chilcoat v. San Juan Cnty., Utah*, 41 F.4th 1196, 1207 (10th Cir. 2022) (citation omitted). Under Rule 12(b)(6), the Court accepts all well-pleaded factual allegations as true and construes them in the light most favorable to the plaintiff. *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1282 (10th Cir. 2019). However, the Court "will disregard conclusory statements and look only to whether the remaining, factual allegations plausibly suggest the defendant is liable." *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

### C. Rule 12(b)(7) Standard

Rule 12(b)(7) allows a court to dismiss a claim for failure to join a party—and cites to Rule 19. Thus, when evaluating a motion under Rule 12(b)(7), the Court must first determine if the absent party is required to be joined under Rule 19(a)(1). Rule 19(a)(1) states: A party "who is

---

[3] When ruling on a 12(b)(6) motion, this Court considers only the four corners of the complaint. There are, of course, exceptions to this rule. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). One such exception is that a court may take "judicial notice of public information that is not reasonably subject to dispute." *Ass'n of Surgical Assistants v. Nat'l Bd. of Surgical Tech. & Surgical Assisting*, 2025 U.S. App. LEXIS 1302, at *3 (10th Cir. Jan. 21, 2025) (unpublished).

Of particular relevance here are the websites. Plaintiffs cite to the Commission's website. *See* **Doc. 5 at ¶ 6** (citing www.commission.ctsrr[.com]/about). The Court takes judicial notice of this website as well as the railroad's more general website at https://cumbrestoltec.com.

Another exception is any "document incorporated by reference . . . when no party disputes its authenticity." *Clinton v. Sec. Ben. Life. Ins. Co.*, 63 F.4th 1264, 1275 (10th Cir. 2023) (cleaned up). Here, the parties incorporated several documents by reference—which the Court also considers.

subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party" if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

If the Court cannot feasibly join an otherwise required party because the party is not subject to service of process or because joinder would destroy subject-matter jurisdiction, the Court must then decide if the party is indispensable. To do this, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b). In making this determination, the Court considers the following factors:

> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

As the proponent of the 12(b)(7) motion, the Cumbres Defendants have "the burden of producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence." *Citizen Band Potawatomi Indian Tribe of Okla. v. Collier*, 17 F.3d 1292, 1293 (10th Cir. 1994) (internal citation omitted). Defendants' burden can be satisfied by providing "affidavits of persons having knowledge of these interests as well as other relevant extra-pleading evidence." *Id.*

## II. State Actor Tests

6

When a litigant seeks to hold a private actor accountable as a state actor, the Tenth Circuit scrutinizes the closeness of the private actor's entanglement with the government under myriad analytical frameworks. *See Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995) ("The Court has taken a flexible approach to the state action doctrine, applying a variety of tests to the facts of each case."). The four tests are: (1) the nexus test, (2) the joint action test, (3) the public function test, and (4) the symbiotic relationship test. *Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013) (listing the four tests). In a nutshell, these tests stand for the following:

1. "A nexus exists only when a state has exercised coercive power over the challenged activity." *Wittner*, 720 F.3d at 775 (10th Cir. 2013); *see also Blum v. Yaretsky*, 457 U.S. 991, 1007–08 (1982). Even so, substantial entanglement with state rules and state funding does not mean state action. The question is "whether the challenged activity results from the State's exercise of coercive power." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 296 (2001).

2. The joint action test asks: Did state officials and the private party act in concert in effectuating the particular deprivation of constitutional rights? *Gross v. Samudio*, 630 F. App'x 772, 779 (10th Cir. 2015) (unpublished). Acquiescence or silence by the State is not enough. *Wittner*, 720 F.3d at 777. Instead, the State and private entity must share a specific goal of violating the Plaintiffs' constitutional rights. *Gallagher*, 49 F.3d at 1455.

3. The public function test looks to see if the challenged action is a traditional and exclusive function of the state. *Gallagher*, 49 F.3d at 1447. This test is "difficult to satisfy," *id.* at 1456, because very few functions are exclusively reserved to the State.

4. Finally, in the symbiotic relationship test, a court must decide if the state insinuated itself into a position of interdependence with a private party such that it must be recognized as a joint participant in the challenged activity. *Wittner*, 720 F.3d at 778. There is no "bright-line rule" for making this determination. *Gallagher*, 49 F.3d at 1452. Extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action. *Id.* at 1451 (citing *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 547 n.29 (1987).

## DISCUSSION

Having laid out the appropriate legal standards above, the Court will now explain why Plaintiffs' FAC must be dismissed, in part.

Even though a court accepts "all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff, if there is a conflict between the allegations in the complaint and the content of the attached exhibit, the exhibit controls." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1105 (10th Cir. 2017); *see Farrell-Cooper Mining Co. v. U.S. Dep't of Interior*, 728 F.3d 1229, 1237 n.6 (10th Cir. 2013) ("Factual allegations that contradict a properly considered document are not well-pleaded facts that the court must accept as true." (cleaned up)). Here, dismissal is required because the Plaintiffs worked for a private company. The FAC alleges the Plaintiffs all worked for "C & T SRR." **Doc. 5 at ¶¶ 2–5**. But, as the websites[4] make clear, the LLC hires, pays, and controls employees work on the railroad. *See supra* n.3.

---

[4] In fact, the railroad's website contains a hyperlink to an employment application. *See* https://cumbrestoltec.com/wp-content/uploads/2024/03/CTSRR-Employment-Application-.pdf.   Upon review, the application makes clear the potential employee is applying to work at "Cumbres Toltec Operating, LLC." *Id.*

8

Conclusory allegations that Plaintiffs were employed by the Commission need not be accepted (**Doc. 5 at ¶¶ 11, 95–100, 108–12**). *See Tavernaro v. Pioneer Credit Recovery, Inc.*, 43 F.4th 1062, 1067 (10th Cir. 2022). In fact, Plaintiffs' filings include a roster of the Commission's commissioners (**Doc. 43-1**) which unequivocally shows Plaintiffs were not members of the Commission. Rather, the Plaintiffs were the employees of the LLC. *See* **Doc. 15 at 5** (citing **Doc. 5 at ¶ 1**); *see also* **Doc. 44 at 1**.

The above legal conclusion informs the Court's analysis in Counts IV–VI.

\* \* \*

Beginning with Count I, though, the Court now explains why the Title VII allegations must be largely dismissed.

## I. Title VII — Counts I–III

### A. Timeliness and exhaustion

Formerly, exhaustion was a jurisdictional prerequisite. *See Payan v. UPS*, 905 F.3d 1162, 1169 (10th Cir. 2018). But no longer. *See Fort Bend Cnty., Tex. v. Davis*, 587 U.S. 541, 550 (2019) ("Title VII's charge-filing requirement is not of jurisdictional cast."); *Lincoln v. BNSF Ry., Co.*, 900 F.3d 1166, 1185 (10th Cir. 2018). Now, a failure to timely exhaust a Title VII claim is simply "subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans. World Airlines*, 455 U.S. 385, 393 (1982). Even though administrative exhaustion is not jurisdictional, it is still "mandatory." *Fort Bend Cnty.*, 587 U.S. at 552. So, because exhaustion is a mandatory rule, this Court "must enforce this exhaustion requirement if . . . properly raise[d]." *Hickey v. Brennan*, 969 F.3d 1113, 1118 (10th Cir. 2020). No matter how much empathy a court has for a particular litigant, these procedural requirements established by Congress are "not to be disregarded." *Id.* (quoting *Baldin Cnty. Welcome Ctr. v. Brown*, 466 U.S. 147, 152 (1984) (per curiam)).

For Plaintiffs' claim under Title VII to be timely, they must have filed an administrative charge within 180 or 300 days of the challenged employment action and have filed suit in federal court within 90 days of receiving the agency's right-to-sue letter. *Proctor v. UPS*, 502 F.3d 1200, 1206 (10th Cir. 2007). The 180-day timeline applies to jurisdictions: (1) "having no FEP[5] agency," or (2) "having a FEP agency without jurisdiction over the statutory basis alleged in the charge." 29 C.F.R. §1601.13(a)(1)–(2).

Here, the Cumbres Defendants raise the defense of exhaustion. *See* **Doc. 15 at 9 n.2 & 23–24**. From their perspective, Plaintiffs' claims are time-barred (***id.* at 23–24**). But the Court thinks otherwise.

- Plaintiff Keenan-Coniglio filed her Charge of Discrimination on January 6, 2023;

- Plaintiff Bond filed his Charge of Discrimination on April 14, 2023;

- Plaintiff Goodwin filed his Charge of Discrimination on June 9, 2023; and

- Plaintiff Hutson filed his Charge of Discrimination on June 26, 2023.

The Cumbres Defendants overlook the fact that the LLC's Operating Agreement (**Doc. 28-1 at 29–30**) states their employment practices "are subject to state and federal labor laws and regulations." The Cumbres Defendants also overlook the 300-day timeline in 29 C.F.R. §1601.13—arguing instead for an application of the 180-day timeline. But both Colorado and New Mexico are deferral[6] States (**Doc. 28 at 26**). *See, e.g., Mascheroni v. Bd. of Regents of the Univ. of Cal.*, 28 F.3d 1554, 1557 (10th Cir. 1994) ("New Mexico is a deferral state."); *Bennett v. Quark,*

---

[5] "FEP" stands for "Fair Employment Practices."

[6] A deferral state is one where the EEOC defers to the enforcement efforts of a state agency empowered to undertake employment discrimination investigations. *See EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110–12 (1988). The New Mexico Human Rights Division is such an agency. *See Hix v. SKS Dev. LLC*, No. 24-cv-175, 2024 U.S. Dist. LEXIS 128114, at *4–5 (D.N.M. July 19, 2024) (Riggs, J.) (citing *Mitchell-Carr v. McLendon*, 1999-NMSC-025, at ¶ 14, 127 N.M. 282, 980 P.2d 65 (1999)).

*Inc.*, 258 F.3d 1220, 1225 n.2 (10th Cir. 2002) ("The 300-day limitations period applies to 'deferral states,' like Colorado.").

In sum, the Court concludes that the Plaintiffs timely filed charges and received right-to-sue letters (**Doc. 5 at ¶ 15**), as required. Thus, the Cumbres Defendants' Motion to Dismiss (**Doc. 15**) Counts I–III as time-barred is **DENIED**.

### B. Title VII framework

The Court now summarizes the plausibility standard applicable to Plaintiffs' Title VII claims. *See* **Doc. 15 at 24; Doc. 28 at 31–33**. The Tenth Circuit has held that prima facie standards are appropriate for a court to consider at the motion to dismiss stage. "While the 12(b)(6) standard does not require that Plaintiff establish a prima facie case in [his] complaint, the elements of each alleged cause of action help to determine whether Plaintiff has set forth a plausible claim." *Khalik*, 671 F.3d at 1192. Applying the *Twombly*/*Iqbal* pleading standard to the case at hand, the Court examines the elements of discrimination and reverse discrimination under Title VII.

Title VII makes it unlawful for an employer to discriminate against any individual with respect to an individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e-2(a)(1). Claims of discrimination are subject to the three-part burden-shifting framework that the Supreme Court established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

First, Plaintiffs must establish a prima facie case. *Notari v. Denver Water Dept.*, 971 F.2d 585, 587 (10th Cir. 1992). Second, if Plaintiffs carries their initial burden by establishing a prima facie claim, the burden shifts to the Defendants to "articulate some legitimate nondiscriminatory reason" for the challenged workplace decision. *Id.* Third, if Defendants carries this burden, then Plaintiffs have an opportunity to prove that the legitimate reasons the defendant offered were merely a pretext for discrimination. *Id.*

11

In addition to discrimination, Title VII also prohibits "employer retaliation on account of an employee's having opposed, complained of, or sought remedies for, unlawful workplace discrimination." *Univ. of Tex Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013) (citing 43 U.S.C. § 2000e-3(a)). Such claims "require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Id.* at 352. Like discrimination, claims of retaliation are subject to the three-part burden-shifting framework in *McDonnell Douglas*. *See Stover v. Martinez*, 382 F.3d 1064, 1070–71 (10th Cir. 2004). The same is true for hostile work environment claims. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664 (10th Cir. 1998).

### C. Plausibility of Title VII claims

The Court now examines each claim in Plaintiffs' FAC purporting to allege Title VII violations (Counts I–III).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Under this standard, the Court must "accept the well-pleaded facts alleged as true and view them in the light most favorable to the plaintiff." *Clinton*, 63 F.4th at 1275.

As explained below, the record here is replete with "general claims" but minimal specifics. *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1191 (10th Cir. 2002). Conclusory allegations will not sustain a plaintiff's pleading burden under Rule 8. *See Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1304 (10th Cir. 1998) (on a motion to dismiss, the court only accepts as true well-pleaded facts, not conclusory allegations).

If a complaint does not contain plausible factual content that allows the court to draw a reasonable inference that the Defendant is liable, then a motion to dismiss is proper. *Brokers'*

*Choice of Am., Inc.*, 861 F.3d at 1100. In other words, dismissal under Rule 12(b)(6) is appropriate if the complaint is legally insufficient. *See Peterson v. Grisham*, 594 F.3d 723, 272 (10th Cir. 2010).

### 1. Discrimination

Title VII prohibits employment discrimination based on race and sex (among other protected classes). *Tracy v. Vail Resorts, Inc.*, 2022 U.S. App. LEXIS 30247, at *8 (10th Cir. Nov. 1, 2022) (unpublished). Although "articulated . . . differently from case to case," *McNellis v. Douglas Cnty. Sch. Dist.*, 116 F.4th 1122, 1139 (10th Cir. 2024), generally, a Title VII discrimination claim must plausibly allege: (1) membership in a protected class, (2) adverse employment action, and (3) circumstances giving rise to an inference of discrimination. *See Ibrahim v. All. for Sustainable Energy, LLC*, 994 F.3d 1193, 1200 (10th Cir. 2021).

### *a. Gender discrimination and reverse gender discrimination*

The FAC alleges the Cumbres Defendants discriminated against Plaintiffs "because of gender or race, or both." **Doc. 5 at ¶¶ 85, 88, 93**. Three Plaintiffs are male, and one is female. This provides an added wrinkle.

Aside from the female Plaintiff, the other three Plaintiffs have majority status. Their allegations, then, are for "reverse discrimination." *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1201 (10th Cir. 2006). Reverse discrimination requires "a stronger showing." *Id.* In lieu of showing that they belong to a protected group, Plaintiffs must establish "background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority." *Id.*

"Pleadings that do not allow for at least a reasonable inference of the legally relevant facts are insufficient." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1236 (10th Cir.

2013). Naturally, the burden is on the plaintiff to "frame a complaint with enough factual matter (taken as true) to suggest that he or she is entitled to relief." *See Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (citation omitted).

Here, the FAC contains insufficient allegations from which a reasonable fact finder could find—or infer—plausibly that "but for" the Plaintiffs' gender, the Cumbres Defendants would have continued employing them. For one, the FAC does not specifically identify the alleged genders of individual actors with any alleged biases (or the genders of the Plaintiffs—except by way of he/she pronouns). Nor does it contain any comparators who are similarly situated. *See Lucero v. Sandia Corp.*, 495 F. App'x 903, 909 (10th Cir. 2012) (unpublished). To the extent various employees discriminated against the Plaintiffs, all the FAC alleges is that this discrimination was because of their "gender."[7] But Plaintiffs' allegations of gender bias make no sense here. The Plaintiffs—comprising both genders—cannot all be targeted for their genders. At best, Plaintiffs' evidence shows Defendants were "equal opportunity jerks[s], to both male and female." *Acosta v. Hilton Grand Vacations, Co., LLC*, No. 15-495, 2017 U.S. Dist. LEXIS 49494, at *27 (D.S.C. Jan. 23, 2017).

To be sure, the FAC alleges one employee made a discriminatory statement against women. *See* **Doc. 5 at ¶ 21**. But no specific allegations directed at the male Plaintiffs are pleaded. Simply saying "I was discriminated against" does not give rise to an inference of discrimination. Even if the Court agrees that it is inappropriate for a coworker to threaten to "beat" another coworker, *see* **id. at ¶ 38**, that is not gender discrimination. Neither is it discrimination when one coworker

---

[7] The words: "men" (pleaded zero times), "man" (also pleaded zero times), and "male" (mentioned three times, but not as a suspect class) are noticeably lacking. Here, the FAC only alleges general claims. For example, the FAC alleges: (1) "Plaintiffs . . . w[ere] discriminated against . . . based on their gender"; (2) the Commission and LLC had "sexist . . . discriminatory intent"; (3) other employees "discriminated on a regular basis against . . . women"; and (4) Defendants "discriminated against Plaintiffs . . . because of gender." **Doc. 5 at ¶¶ 1, 31, 67, 85**.

expresses a desire to "kick [Plaintiff's] ass." *Id.* at ¶ 59. Plainly, the FAC doesn't allege Defendants discriminated against men—instead, Defendants were just equal opportunity jerks.

In sum, Plaintiffs have not plausibly alleged facts to show they were treated differently from their fellow employees because they are men (or a woman). *Cf. Ibrahim*, 994 F.3d at 1201. By all accounts, the Cumbres Defendants hired plenty of men and women.[8] And there is no evidence that either gender/sex suffered adverse treatment as a class in the workplace. The Court grants Defendants' Motion to Dismiss (**Doc. 15**) as to the gender/sex discrimination and reverse gender discrimination claims.

### *b. Reverse race discrimination*

Next, Plaintiffs argue they experienced hostility—and were discharged—because of their "race." **Doc. 5 at ¶¶ 1 & 85**. But Plaintiffs are "all White/Caucasian/Anglo." **Doc. 15 at 1**; *see also* **Doc. 5 at ¶¶ 30, 35, 45, 53**. Accordingly, the "but for" standard applies to Plaintiffs when establishing a prima facie case of reverse racial discrimination. *Gerovic v. City & Cnty. of Denver*, 2023 U.S. App. LEXIS 4935, at *18 (10th Cir. Mar. 1, 2023) (unpublished).

An adverse employment action could be any number of consequences, including "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). As pleaded in the FAC, Plaintiffs did not demonstrate the Cumbres Defendants' actions were "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Payan*, 905 F.3d at 1172.

---

[8] Based on Plaintiffs' FAC, the Court knows that several other women worked on the railroad. The FAC mentions: (1) "a female employee, Lainey Zook," **Doc. 5 at ¶ 21**; (2) "Kim Smith-Casford," *id.* at ¶ 22; and (3) other "women" employees. *Id.* at ¶ 67.

Regarding Smith-Casford, and consistent with the logic explained earlier, *see supra* n.3, Kim is a woman. http://commission.ctsrr.com/commissioners/kim-smith-casford/.

The Cumbres Defendants point to a legitimate and non-discriminatory reason that each Plaintiff's employment ended. Plaintiffs Bond and Hutson were terminated for cause,[9] whereas Plaintiffs Keenan-Coniglio and Goodwin were not subjected to any adverse employment action. Aside from saying these actions were "pretext," Plaintiffs offer no facts to support this conclusion. *See* **Doc. 5 at ¶¶ 66 & 76**. Accordingly, Defendants argue that not all Plaintiffs sufficiently allege an adverse employment action (**Doc. 15 at 24–25**).

Ultimately, the Court grants Defendants' Motion to Dismiss the Title VII claim in Count I, with respect to racial discrimination. Plaintiffs have failed to plausibly allege: (1) "background circumstances that support an inference that the defendant is one of those unusual employers who discriminates against the majority," *Notari*, 971 F.2d at 589, or (2) "indirect evidence sufficient to support a reasonable probability that but for the plaintiff[s'] status" they would not have suffered the challenged employment decision, *id.* at 590.

## 2. Hostile Work Environment

Title VII also prohibits discriminatory conduct that is "sufficiently severe or pervasive" to create a hostile work environment. *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986). But the "mere utterance of an epithet which engenders offensive feelings" does not implicate Title VII. *Harris v. Forklift Sys.*, 510 U.S. 17, 21 (1993) (cleaned up). More is required. This Court must look at "all of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's performance." *Id.* at 23. In the Tenth Circuit—as well as several other courts[10] of appeals—sporadic discriminatory comments are

---

[9] Plaintiffs Bond and Hutson were terminated for timecard fraud. *See* **Doc. 5 at ¶¶ 43 & 68**.
[10] In candor, there is a circuit split on the issue of whether a singular use of a racial epithet is sufficient under Title VII. *See Collier v. Dallas Cnty. Hosp. Dist.*, 827 F. App'x 373, 377 (5th Cir. 2020) (unpublished), *petition for cert. filed* (U.S. Jan. 15, 2021) (No. 20-1004). The Fifth, Sixth, Seventh, Eighth,

insufficient under Title VII. *See, e.g., Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) ("Instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments."); *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) (Holmes, J.).

To establish a prima facie hostile-work-environment claim under Title VII, a plaintiff must allege: "(1) membership in a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was due to race; and (4) the harassment was so severe or pervasive that it altered a term, condition, or privilege of his employment and created an abusive environment." *Young v. Colo. Dep't of Corr.*, 94 F.4th 1242, 1249 (10th Cir. 2024).

### *a. Race-based harassment*

Here, Count II alleges a hostile work environment by way of "sexual and racial harassment." **Doc. 5 at ¶ 89**. Upon review, the FAC asserts that: (1) Bond faced discrimination that included being called "white boy," **Doc. 5 at ¶ 38**; (2) Goodwin and non-Hispanic workers often heard slurs such as "white boy," on a regular basis, *id.* **at ¶ 45**; and (3) Hutson was subjected to racial slurs including "white boy" and "guero," *id.* **at ¶ 70**. Only Plaintiff Keenan-Coniglio specifically alleges her race in the FAC (**Doc. 5 at ¶¶ 24 & 30**). But none of the Plaintiffs explicitly allege membership in a protected class (*i.e.*, Caucasians, Anglos, or white people). The Court is not convinced the Plaintiffs properly pleaded protected membership. Nevertheless, the Court concludes the FAC put the Cumbres Defendants on notice. But this is an exceptionally close call.

What about elements two and three? Did the Plaintiffs allege "unwelcome harassment" that was "due to race"?

---

and Tenth Circuits have all held sporadic or single uses of racial epithets are not severe enough to establish a hostile work environment. *See id.* (Cert. Pet.) at 12–16. Even though the Supreme Court denied certiorari, *see* 141 S. Ct. 2657 (May 17, 2021), the petition is a useful summary of the issue. The pending case of *Ames v. Ohio Dep't of Youth Servs.*, 87 F.4th 822 (6th Cir. 2023), *cert. granted*, 145 S. Ct. 118 (U.S. Oct. 4, 2024) presents a similar question—but until such time as the Supreme Court rules on that case, Tenth Circuit law controls.

Even if the statements are offensive—not all offensive conduct is actionable as illegal harassment. In fact, "run-of-the-mill boorish, juvenile, or annoying behavior that is not uncommon in American workplaces . . . is not the stuff of a Title VII hostile work environment claim." *Morris v. City of Colo. Springs*, 666 F.3d 654, 664 (10th Cir. 2012). Title VII does not establish a "general civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

The Court now summarizes the race-based comments:

- Plaintiff Keenan-Coniglio "heard employees and supervisors make remarks suggesting that she, as an Anglo woman, was not welcome in the workplace. **Doc. 5 at ¶ 24.**

- Plaintiff Bond heard an employee say, "there are too many white people." *Id.* **at ¶ 35**. Bond was even called "white boy." *Id.* **at ¶ 38**.

- Likewise, Plaintiff Goodwin was called "white boy," "gringo," and "guero." *Id.* **at ¶ 45**.

- Similarly, Plaintiff Hutson was called "white boy," and "guero." *Id.* **at ¶ 70**.

\* \* \*

Here, Plaintiffs' subjective beliefs regarding the alleged harassment are not objectively reasonable.

For one, the word "gringo" is a term "mainly used in Spanish-speaking countries to refer to an English-speaking foreigner, especially an American person." *See* MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 550 (11th ed. 2003) (defining "gringo" as "a foreigner in Spain or Latin America esp. when of English or American origin; broadly: a non-Hispanic person"). Additionally, use of "guero" is not objectively offensive. It simply means "a person with light skin and/or blond hair." *Guero*, WIKTIONARY: THE FREE DICTIONARY, https://en.wiktionary.org/wiki/güero (last visited Oct. 11, 2024). The Court also looks to the "Urban Dictionary" for support (this is not a

trailblazing move).[11] According to that platform's definition, guero isn't racialized. Rather, "[i]t is a descriptive term used to refer to anyone with a lighter skin complexion. It is NOT exclusive to any one racial or ethnic group." *Guero*, URBANDICTIONARY, https://www.urbandictionary.com/define.php?term=Guero (last visited October 11, 2024). With these definitions in mind, the Court finds it farfetched to conclude the words "gringo" or "guero" constitute harassment. Even so, the Court gives Plaintiffs the benefit of the doubt.

This leaves the severity and pervasiveness prong. "Whether an environment is illegally hostile or abusive 'can be determined only by looking at all the circumstances, and factors may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the use and enjoyment of the premises].'" *Jackson v. Park Place Condos. Ass'n, Inc.*, 619 F. App'x 699, 704 (10th Cir. 2015) (quoting *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir. 1996)). Here, the Plaintiffs worked for the Cumbres Defendants from approximately May 2017 to November 2022.[12] Six specific comments over a five-year period to four different employees is

---

[11] Three different judges within the Tenth Circuit have authored opinions citing to Urban Dictionary. *See Bickford v. Hensley*, 832 F. App'x 549, 554 n.3 (10th Cir. 2020) (unpublished) (Carson, J.); *United States v. Bindues*, No. 22-cr-466, 2023 U.S. Dist. LEXIS 77001, at *4–5, nn.1 & 2 (D.N.M. May 3, 2023) (Browning, J.); *Dailey v. Hecht*, No. 16-cv-581, 2017 U.S. Dist. LEXIS 2755, at *9 n.4 (D. Colo. Jan. 6, 2017) (Jackson, J.).

This is not terribly surprising. As Eleventh Circuit Judge Kevin Newsom opined, "[a]s occasionally happens, the dictionaries le[ave] a little something to be desired." *Snell v. United Specialty Ins. Co.*, 102 F.4th 1208, 1223 (11th Cir. 2024) (Newsom, J., concurring). Here, instead of relying solely on the dictionary definition—the Court has looked to Wikipedia and Urban Dictionary. These resources have value, too. Especially in determining the contemporary meaning and usage.

For example, back in 1933, the Utah Supreme Court used the term "muggle" to describe "marihuana." *State v. Navaro*, 83 Utah 6, 15 (1933). This was, no doubt, cutting edge in a pre-Harry Potter era. These non-traditional sources confirm this usage—while traditional dictionaries do not. *See, e.g., Weed Muggle*, URBANDICTIONARY, https://www.urbandictionary.com/define.php?term=Weed%20Muggle (last visited Oct. 11, 2024); *List of Slang Names for Cannabis*, WIKIPEDIA: THE FREE ENCYCLOPEDIA, https://en.wikipedia.org/wiki/List_of_slang_names_for_cannabis (last visited Oct. 11, 2024).

[12] Plaintiff Hutson's employment with the railroad began in May 2017, whereas Plaintiff Bond was hired in March 2018; Plaintiff Goodwin was hired in May 2018; and Plaintiff Keenan-Coniglio was employed during the 2021 and 2022 seasons.

not severe or pervasive. These are, quite obviously, "a few isolated incidents." *Bolden*, 43 F.3d at 551.[13] The rhetoric about white boys, guero, and gringo did not "permeate[] with discriminatory intimidation, ridicule, and insult." *Young*, 94 F.4th at 1249. Thus, "it is not enough that [these] particular plaintiff[s] deem[] the work environment hostile," because the comments are not "of the character that it would be deemed hostile by a reasonable employee under the same or similar circumstances." *Lounds*, 812 F.3d at 1222.

Plaintiffs failed to provide enough factual allegations with sufficient specificity to plead a race-based hostile work environment claim. Dismissal is appropriate with respect to the alleged hostile work environment premised upon "racial harassment." **Doc. 5 at ¶ 89**.

### *b. Sexual harassment*

The Court now undertakes the same analysis, but with respect to "sexual harassment." Plaintiffs must, again, prove: "(1) membership in a protected class; (2) he was subjected to unwelcome harassment; (3) the harassment was due to [sex]; and (4) the harassment was so severe or pervasive that it altered a term, condition, or privilege of his employment and created an abusive environment." *Young*, 94 F.4th at 1249.

The FAC lists the following factual allegations (which, again, the Court accepts as true):

- Plaintiff Keenan-Coniglio states that she was "subjected to unwanted physical attention" from one employee who "asked her out on dates [and] hugged her." **Doc. 5 at ¶ 19**.

---

[13] Consistent with *supra* n.9, the Court now highlights a few of the cases where other courts have come to the same result. *See, e.g., Jackson v. Quanex Corp.*, 191 F.3d 647, 662 (6th Cir. 1999) (explaining that "simple teasing, offhand comments, and isolated incidents" do not amount to discrimination under Title VII); *Dandy v. UPS*, 388 F.3d 263, 271 (7th Cir. 2004) ("[O]ffhand comments, and isolated incidents (unless extremely serious) are not sufficient to sustain a hostile work environment claim."); *Woodland v. Joseph T. Ryerson & Son, Inc.*, 302 F.3d 839, 844 (8th Cir. 2002) ("Sporadic racially-motivated misconduct by coworkers is neither severe nor pervasive enough to create a hostile work environment."); *see also Stepheny v. Brooklyn Hebrew Sch. for Special Child.*, 356 F. Supp. 2d 248, 264 (E.D.N.Y. 2005) (concluding the utterance of "white bitch" five times over a five month period fails under Title VII).

Keenan-Coniglio was also called "'princess' a couple of times." *Id.* at ¶ **23**. Additionally, Plaintiff Keenan-Coniglio alleges she heard employees and supervisors make remarks "suggesting that she, as an Anglo woman, was not welcome in the workplace." *Id.* at ¶ **24**. She also alleges that male employees called one another "pussy." *Id.* at ¶ **26**.

- o  In addition to these acts directed at her, Keenan-Coniglio alleges the following:

   - ▪  She heard (but was not told) that any "woman on Fire Patrol" would have to be "ugly or married." *Id.* at ¶ **21**.

   - ▪  She also witnessed a male employee sexually harassing a different female employee by asking "what sex acts" can she perform with her "tongue ring." *Id.* at ¶ **21**.

   - ▪  She was told that coworkers "were talking about her in a sexual manner." *Id.* at ¶ **26**.

- •  Plaintiff Bond claims that in October 2021, he, Goodwin, and Hutson were collectively "referred to as 'faggots.'" *Id.* at ¶ **35**. Bond was also on the receiving end of sexually explicit comments about his girlfriend.[14] *Id.* at ¶ **42**. Additionally, on one occasion, an employee stuck "his finger between Bond's buttocks." *Id.*

---

[14] To be sure, third-party hostile-work-environment claims have been recognized in this Circuit. *See Durand v. Shull*, 2022 U.S. App. LEXIS 10776, at *6 n.3 (10th Cir. Apr. 21, 2022) (unpublished); *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072–74 (10th Cir. 1998). But these cases deal with management not stepping in when lower-level employees are the hostile actors. This Court found no case where a non-employee third-party is the target of abuse and an employee then subsumes that malintent as a basis for suing.

To be sure, these allegations fall into the "jerk" category. But Plaintiff Bond does not have any cognizable injury based on the harassment of a third-party non-employee. *See, e.g., Bermudez v. TRC Holdings, Inc.*, 138 F.3d 1176, 1180 (7th Cir. 1998) (white employees lacked standing to allege injury on behalf of black applicants who were discriminated against); *Childress v. City of Richmond*, 134 F.3d 1205, 1209 (4th Cir. 1998) (en banc) (Luttig, J., concurring); *Patee v. Pac. Nw. Bell Tel.*, 803 F.2d 476, 478 (9th Cir. 1986) ("[M]ale workers cannot assert the right of their female co-workers to be free from discrimination based on their sex."); *see also Moore v. Total Sleep Diagnostics of Kan., Inc.*, No. 00-cv-2521, 2001 U.S. Dist. LEXIS 9907, at *3–8 (D. Kan. July 9, 2001).

o   Bond heard coworkers refer to Plaintiff Keenan-Coniglio as a "dyke." *Id.* **at ¶ 39**.

- Plaintiff Goodwin was called "white boy faggot." *Id.* **at ¶ 45**. He also alleges "sexual jokes," and "sexual comments" were made regularly. *Id.* **at ¶ 47**.

- Plaintiff Hutson alleges no gender or sexual harassment allegations.

The three males report widely varying experiences. Thus, it cannot be said they sufficiently pleaded a hostile work environment claim based on being men.

Plaintiff Keenan-Coniglio is different. She, the only female, was subjected to frequent unwanted comments and touching. The conduct, as pleaded, was so severe and pervasive that the male Plaintiffs even heard these comments. *See Ford v. Jackson Nat'l Life Ins. Co.*, 45 F.4th 1202, 1232 (10th Cir. 2022) (noting that "evidence directed at others . . . is relevant" in the hostile work environment analysis). So, even though the facts alleged by the males do not support their claim, the FAC support hers.

Dismissal is appropriate with respect to the male Plaintiffs' allegations of a hostile work environment premised upon gender or sex, **Doc. 5 at ¶¶ 88 & 89**, but Plaintiff Keenan-Coniglio's claim survives the motion to dismiss.

### 3. Retaliation

To survive a motion to dismiss, a plaintiff asserting a Title VII retaliation claim must plausibly allege: "(1) that she engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." *Reznik v. Incontact, Inc.*, 18 F.4th 1257, 1260 (10th Cir. 2021).

The Cumbres Defendants argue Plaintiffs do not allege plausible retaliation claims for the following reasons.

First, Plaintiff Keenan-Coniglio's seasonal employment ending is not causally connected to any protected activity (**Doc. 15 at 26**). Although she was placed on administrative leave, the FAC does not specify whether this was paid or unpaid (*id.*). Additionally, Keenan-Coniglio does not allege she ever sought continued employment or re-employment. The end of seasonal employment "is not a materially adverse action." *Id.*

Next, three months elapsed between Plaintiff Bond's complaint and his firing for cause. *Id.*; *see Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (explaining that a "three-month period, standing alone, is insufficient to establish causation"). Thus, he cannot avail himself of the temporal-proximity rule—nor does he adequately plead pretext.

Third, Plaintiff Goodwin did not return to work of his own volition. *Id.* **at 7–8**. Clearly, he cannot claim (at least with a straight face) that he was "actually or constructively" discharged. **Doc. 5 at ¶ 92**. His only basis for the retaliation claim, then, involves an allegation about being denied a promotion—but again, the FAC does not allege Plaintiff Goodwin applied for any promotion. *See* **Doc. 15 at 8** (citing **Doc. 5 at ¶ 49**).

Finally, Plaintiff Hutson claims he was retaliated against for participating in a race-based harassment investigation (**Doc. 5 at ¶ 82**). But once again, more than three months elapsed between this protected act and his termination. Hutson claims pretext but offers no additional evidence to establish causation.

For these reasons, the Court dismisses Plaintiffs' retaliation claims in Count III.

## II. New Mexico Whistleblower Protection Act — Count IV

In the FAC, Plaintiffs allege "Defendants Commission and LLC are thus public employers within the meaning of the Whistleblower Protection Act." **Doc. 5 at ¶ 96**. They further allege that "Defendants Commission and LLC retaliated against Plaintiffs." *Id.* **at ¶ 99**.

The Court now unpacks these assertions—starting with the statutory language.

For starters, the NMWPA forbids public employers from "tak[ing] any retaliatory action against a public employee because the public employee" engages in protected conduct. NMSA 1978 § 10-16C-3. A public employee is "a person who works for or contracts with a public employer. NMSA 1978 § 10-16C-2(B). And a public employer means:

> (1) any department, agency, office, institution, board, commission, committee, branch or district of state government;
> (2) any political subdivision of the state, created under either general or special act, that receives or expends public money from whatever source derived;
> (3) any entity or instrumentality of the state specifically provided for by law; and
> (4) every office or officer of any entity listed in Paragraphs (1) through (3) of this subsection.

NMSA 1978 § 10-16C-2(C)(1)–(4). In light of these definitions, the Cumbres Defendants assert they are not subject to the NMWPA.

Plaintiffs push back. They argue the Commission is subject to the NMWPA because the statute is in approbation and not in reprobation[15] of the Compact (**Doc. 28 at 33**). In essence, because Colorado also has a whistleblower statute that means the Cumbres Defendants can be sued under the NMWPA. *See id.* at 33–36. In so doing, Plaintiffs cite to various nonprecedential cases.[16]

---

[15] The prohibition against "approbation and reprobation" derives from Scottish law. *See Heth v. Commonwealth*, 126 Va. 493, 498 (1920). At its core, this prohibition forces a litigant to elect a particular position and confines him to that first-adopted position. Nowadays, this concept is known as judicial estoppel. *Matthews v. Matthews*, 277 Va. 522, 529 (2009).

No matter the name, this doctrine is "a powerful weapon . . . and there are often lesser weapons that can keep alleged inconsistent statements in check." *Lucero v. Citelum US, Inc.*, No. 18-cv-1088, 2019 U.S. Dist. LEXIS 217729, at *3 (D.N.M. Dec. 17, 2019) (Johnson, C.J.) (quoting *Vehicle Market Rsch. v. Mitchell Intern, Inc.*, 767 F.3d 987, 992–93 (10th Cir. 2014)).

Additionally, the Court is not convinced the doctrine applies—given that the Cumbres Defendants are not arguing contrary positions. Rather, Defendants argue they are not subject to the NMWPA because of differences between New Mexico and Colorado law. This is not inconsistent with any other position previously advanced. *See New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001) (listing factors to "inform the decision" about whether to apply the doctrine).

[16] Plaintiffs cite to: (1) *Del. River Port Auth. v. Frat. Order of Police*, 290 F.3d 567, 570 (3d Cir. 2002); (2) *Penn-Jersey Lodge 30 v. DRPA*, 323 N.J. Super. 444 (1999); (3) *Gray v. N.D. Game & Fish Dep't*, 706 N.W.2d 614, 620 (N.D. 2005); (4) *Int'l Union of Operating Eng'rs, Local 68 v. Del. River & Bay Auth.*,

The Court finds the NMWPA claim is insufficiently plead for a few reasons.

For one, Cumbres Toltec Operating, LLC, is—by its name and nature—an LLC. The Plaintiffs were employed by the LLC.[17] And an LLC is not a public employer under the NMWPA. *See Janet v. Marshall*, 2013-NMCA-037, at ¶¶ 18–20, 296 P.3d 1253 (N.M. Ct. App. 2012). Therefore, the LLC does not fall into the purview of NMWPA.

Next, the Court turns to Plaintiffs' approbation argument (**Doc. 28 at 33–36**) and finds it to be without merit.

Colorado's "whistle-blower statute . . . protects state employees." *Ward v. Indus. Comm'n*, 699 P.2d 960, 962 (Colo. 1985). But Colorado law makes clear the Commission's "members and employees are not officers and employees of either of the states." C.R.S. § 24-60-1902. Colorado's whistleblower statute also requires a complainant to file an internal complaint prior to suing. C.R.S. §§ 24-50.5-104 & 105. So, to the extent Plaintiffs argue the States have similar whistleblower statutes, that argument is not persuasive. The Commission is statutorily exempt from Colorado's whistleblower statute. And there is no intimation that an LLC could be sued under

---

147 N.J. 433, 447-48 (N.J. 1997); (5) *Hubble v. Bi-State Dev. Agency*, 238 Ill. 2d 262, 278 (Ill. 2010); and (6) *Holz v. Smullan*, 277 F.2d 58, 62 (7th Cir. 1960). *See* **Doc. 28 at 33–36**.

[17] Although Plaintiffs may think they worked for the Commission, they did not. Only the Commissioners work for the Commission. The employees of the railroad are employees of the LLC. This is clear as a matter of law based upon the statutes mentioned throughout. And this Court need not accept as true Plaintiffs' conclusory allegation on their employer.

At the same time, the confusion likely comes from the organizational structure. For example, the Exhibits bear the name "Cumbres & Toltec Scenic Railroad." But as the Cumbres Defendants made clear, that is not the name of either the Commission or the LLC. It is, however, the label and imagery from the railroad's website. *See* https://cumbrestoltec.com/.

After clicking, searching, and reading the website, it becomes clear that the railroad "is operated by Cumbres Toltec Operating a non-profit LLC." In fact, the "Employment Application" on the website states the employer is "Cumbres Toltec Operating, LLC." *See* Cumbres & Toltec Scenic Railroad, *Employment Application*, https://cumbrestoltec.com/wp-content/uploads/2024/03/CTSRR-Employment-Application-.pdf [https://perma.cc/6FFF-7AXA]. The Court's reference to evidence outside the pleadings "does not convert the motion to dismiss into a motion for summary judgment." *Graff v. Aberdeen Enterprizes, II, Inc.*, 65 F.4th 500, 507 (10th Cir. 2023).

the Colorado law. The remaining question, then, is whether the Commission can be sued under the NMWPA?

Answering this question is difficult.

The Commission was created by Compact, and a Compact constitutes "not just a contract," but also "a federal statute enacted by Congress." *New York v. New Jersey*, 598 U.S. 218, 224 (2023). Expanding the Commission's liability beyond the terms of the Compact—and the Amendment—runs afoul of the Compact Clause and state sovereignty. *See* U.S. Const. art. I, § 10, cl. iii; U.S. Const. amend. XI.

An analogy (of sorts) may prove helpful. Bills of attainder and ex post facto laws apply "to laws of a criminal." *Ogden v. Saunders*, 25 U.S. 213 (12 Wheat.) 267 (1827). A criminal defendant cannot be punished retroactively for conduct that was then-legal. In much the same way, retrospective laws are forbidden in the civil context when, as here, they impair the obligation of contracts. *See Carpenter v. Pennsylvania*, 58 U.S. (17 How.) 456 (1855) (citing *Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798)). At its core, this means a State's power to pass laws can "have no effect on contracts made before their enactment." *Cook v. Moffat & Curtis*, 46 U.S. 295 (5 How.) 308 (1847).

All that to say, the NMWPA's potential expansion of liability against the Commission in New Mexico—but not Colorado—undermines the States' contractually bargained-for agreement. The 1970 Compact (as well as its 1977 Amendment) and the 2010 NMWPA are like oil and water—they do not mix.

The Court also finds support for this conclusion in New Mexico state jurisprudence. Like the federal judiciary, the New Mexico courts have also adopted the state action doctrine. *See State ex rel. Toomey v. City of Truth of Consequences*, 2012-NMCA-104, ¶ 13, 287 P.3d 364 (N.M.

2012). In so doing, New Mexico precedent—at least in the realm of Inspection of Public Records Act ("IPRA")[18]—applies a nonexclusive nine-factor test. *See Pacheco v. Hudson*, 2018-NMSC-022, ¶ 29, 415 P.3d 505 (N.M. 2018) (citation omitted). Those factors are:

> (1) the level of public funding; (2) commingling of funds; (3) whether the activity was conducted on publicly owned property; (4) whether the services contracted for are an integral part of the public agency's chosen decision-making process; (5) whether the private entity is performing a governmental function or a function which the public agency otherwise would perform; (6) the extent of the public agency's involvement with, regulation of, or control over the private entity; (7) whether the private entity was created by the public agency; (8) whether the public agency has a substantial financial interest in the private entity; and (9) for whose benefit the private entity is functioning.

*Id.* (cleaned up). The Court reasons that factors two, seven, and eight weigh in Plaintiffs' favor. The remaining factors, however, do not. The level of public funding is surpassed by ticket revenue (**Doc. 15-4**). The FAC does not allege the jurisdictional question in factor three. In factor four, the LLC was not a decision-maker in any policies. Factor five and six also favor Defendants. On balance, then, the Court concludes the factors weigh against finding the LLC falls within the NMWPA's purview.[19] *See Duran v. N.M. Monitored Treatment Program*, 2000-NMCA-023, ¶¶ 20–27, 128 N.M. 659, 996 P.2d 922 (N.M. Ct. App. 2000) (finding no state action for a § 1983 cause of action in a hospital employment setting); *cf. State v. Santiago*, 2009-NMSC-045, ¶¶ 29–37, 147 N.M. 76, 217 P.3d 89 (N.M. 2009) (concluding private security guards were not state

---

[18] IPRA is the New Mexico state-level equivalent of the Freedom of Information Act. Both provide the public with access to governmental records.

[19] Again, these factors are derived from IPRA cases. This Court was unable to find any New Mexico case citing these factors in the context of the NMWPA. *See, e.g., Pacheco*, 2018-NMSC-022, at ¶¶ 27–36 (finding a state judge's election campaign on social media were not a public record within the scope of IPRA); *N.M. Found. v. Corizon Health*, 2020-NMCA-014, 460 P.3d 43 (N.M. Ct. App. 2019) (discussing what documents are subject to disclosure under IPRA); *Libit v. Univ. of N.M. Lobo Club*, 2022-NMCA-043, 516 P.3d 217 (N.M. Ct. App. 2022) (construing IPRA broadly).

Nevertheless, a federal court sitting in diversity must apply state law. And if that court has not spoken, this Court must endeavor to predict the interpretation it would adopt. *See Moreno v. Zimmerman*, 2023 U.S. App. LEXIS 19053, at *23 (10th Cir. July 26, 2023) (unpublished) (Holmes, C.J.) (citing *Armijo v. Ex Cam, Inc.*, 843 F.2d 406, 407 (10th Cir. 1988)). In this regard, these cases are helpful for determining if New Mexico courts would allow the LLC to be sued under the NMWPA.

actors). At the same time, though, this analysis may be giving Plaintiffs' pleading more credit than is due. Perhaps the fact there are no New Mexico cases expanding the NMWPA in a manner similar to IPRA is the end of the road.

Finally, the FAC does not plead sufficient facts for a plausible NMWPA claim by a public employer as to a public employee. On this point, all the FAC alleges is: (1) "Defendant Commission alone or in conjunction with its operating arm, the LLC met the definition of . . . a public employer under the NMWPA," **Doc. 5 at ¶ 11**, and (2) "The Commission is a public commission of the State of New Mexico, created by the Cumbres and Toltec Scenic Railroad Act. Defendants Commission and LLC are thus public employers within the meaning of the Whistleblower Protection Act," ***id.* at ¶ 96**. But these are legal conclusions—which the Court must disregard. *See Goodwill Indus. of Cent. Okla., Inc. v. Phila. Indem. Ins. Co.*, 21 F.4th 704, 712 (10th Cir. 2021); *see also Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) ("The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." (cleaned up)). Thus, Plaintiffs have not alleged sufficient facts to support a finding that they[20] are "public employees" as defined by the NMWPA. *See Gardner v. N.M. Health Ins. Exh.*, 2023 N.M. App. Unpub. LEXIS 81, at *5–6 (N.M. Ct. App. 2023) (unpublished) (finding a "nonprofit public corporation" is not a "public employer for purposes of the [NM]WPA"); *Castro v. Univ. of N.M. Med. Grp.*, 2023 N.M. App. Unpub. LEXIS 421, at *11–

---

[20] There is one New Mexico Court of Appeals case that explains the NMWPA only applies to "employees who *presently* work for or contract with a public employer." *Anderson v. Second Jud. Dist. Ct.*, 2024 N.M. App. Unpub. LEXIS 44, at *14 (N.M. Ct. App. Feb. 8, 2024). This is consistent with the New Mexico Supreme Court's ruling in *Flores v. Herrera*, 2016-NMSC-033, 384 P.3d 1070 (N.M. 2016), wherein the Court held that the NMWPA does not apply to former officers. *Id.* at ¶ 11.

The Court does not apply this present tense requirement; but instead, simply points out another ruling that cuts against Plaintiffs.

13 (N.M. Ct. App. Dec. 7, 2023) (unpublished) (concluding a nonprofit corporation created under the "University Research Park and Economic Development Act" is not subject to the NMWPA).

For these reasons, the Court concludes Count IV is dismissed.

## III. Section 1983 — Count VI

The final claim the Cumbres Defendants seek dismissal of is Count VI—alleging a violation of § 1983 based upon municipal liability against the Commission. *See* **Doc. 5 at 30**; *see also* **Doc. 28 at 22–26**. Resolution of this issue requires the Court to answer a few questions. Specifically, what is the character of the Cumbres Defendants? First, was the LLC (the Plaintiffs' employer) engaged in state action? And second, irrespective of this finding, is the Commission an arm of the States? *See generally Good v. U.S. Dep't of Educ.*, 121 F.4th 772 (10th Cir. 2024) (Holmes, C.J.).

### A. Municipal liability

The FAC alleges the Commission deprived Plaintiffs of their rights pursuant to: (1) a well-established custom or practice, and (2) "because [Defendant] Gibbs acted as [the railroad's] final decision maker." **Doc. 5 at ¶ 109**. Count VI, then, is a claim for municipal liability under *Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978). *See* **Doc. 28 at 23**. When alleging a *Monell* claim for municipal liability under § 1983, a plaintiff must do more than recite conclusory statements. Instead, "municipal liability . . . attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1188–89 (10th Cir. 2010).

Plaintiffs allege the Commission violated their rights through: (1) custom or informal policy, (2) deliberate indifference, and (3) actions and inactions of the final decisionmaker. *See* **Doc. 5 at ¶ 109**; *see also* **Doc. 28 at 24**. The Court addresses these theories.

First, the Court looks to the "informal custom or policy" aspect. The Cumbres Defendants argue that Plaintiffs failed to sufficiently plead a policy or custom and a causal connection to the alleged constitutional violation (**Doc. 40 at 15–18**). The Court agrees. To survive dismissal, the FAC must sufficiently allege the custom amounted to "a widespread, permanent, and well-settled practice." *N.E.L. v. Douglas Cnty., Colo.*, 740 F. App'x 920, 933 (10th Cir. 2018) (unpublished). Upon reviewing the FAC, the Court identifies only a few factual allegations that could possibly support the informal custom allegation. *See* **Doc. 5 at ¶¶ 39, 46, 52**. Plaintiffs' Response relies on conclusory legal statements. *See* **Doc. 28 at 24–25** (citing **Doc. 5 at ¶ 109**). But even so, a few acts by various employees do not rise to the level of widespread. Nor are there any facts alleging this policy or custom was "the moving force behind the constitutional deprivation." *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004). As far as the Court can tell, the deliberate indifference "state of mind" requirement isn't pleaded at all. All Plaintiffs allege is that "The Commission acted in a deliberately indifferent manner towards Plaintiffs because it had actual or constructive notice that its actions or failures to act were substantially certain to result in a constitutional violation and consciously chose to disregard the risk of harm." **Doc. 5 at ¶ 110**. This isn't enough. *Cf.* **Doc. 40 at 18** ("Nothing in Plaintiffs' response identifies factual allegations whereby the Commission became aware of any alleged discriminatory practices."). At best, Plaintiffs' allegations show it's possible that the Commission's failure to act led to their injuries— but the pleading standard requires plausibility. *N.E.L.*, 740 F. App'x at 934 (citing *Iqbal*, 556 U.S. at 678).

Based upon the language in the FAC, Count VI asserts an official capacity/municipal liability claim by alleging Gibbs was an official decision maker (the allegation needed to maintain an individual capacity claim); but, at the same time, the Response argues Gibbs was a final policy maker (an allegation needed to maintain an official capacity claim). *Compare* **Doc. 5 at ¶ 109**, *with* **Doc. 28 at 23–26**. But just because Gibbs is a policy maker does not necessarily make him a decisionmaker on hiring/firing decisions. "The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–82 (1986). As best as the Court can tell, the actions taken by Defendant Gibbs that are "fairly attributable to the municipality" are nothing more than listening.[21] *Simmons v. Uintah Health Care Special Serv. Dist.*, 506 F.3d 1281, 1287 (10th Cir. 2007). But even if Gibbs prohibited Goodwin from punishing Hispanic employees, that is not a constitutional violation on its face. The FAC does not allege that Goodwin was a supervisor who should be punishing employees. Although constitutional implications are possible, they are not plausible. Thus, the Court holds that Plaintiffs have failed to allege facts in support of the bare assertion that a custom or policy existed or that the violation of his constitutional rights was pursuant to a decision by a policy maker. This means Count VI must be dismissed.

### B. State action

---

[21] The FAC alleges the following actions/inactions taken by Defendant Gibbs: (1) Plaintiff Bond complained verbally to Gibbs, *see* **Doc. 5 at ¶ 36**; (2) Bond also filed a complaint with Gibbs about Keenan-Coniglio's treatment, *id.* **at ¶ 39**; (3) Plaintiff Goodwin reported safety issues to Gibbs, *id.* **at ¶ 44**; (4) Plaintiffs Goodwin and Hutson complained about repair work to Gibbs, *id.* **at ¶ 48**; (5) Goodwin reported other safety issues to Gibbs, *id.* **at ¶ 55**; and (6) so did Plaintiff Hutson, *id.* **at ¶¶ 72 & 74**. These do not give rise to anything. Listening—even if done poorly—is not a legitimate basis for a lawsuit.

The FAC contains one concrete constitutional allegation—namely, Plaintiff Goodwin claims that Defendants Avery and Gibbs prohibited Goodwin from punishing Hispanic employees. *See* **Doc. 5 at ¶ 46**.

The LLC's decision to terminate[22] Plaintiffs cannot amount to state action under the nexus test. Finding state action requires "a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Blum*, 457 U.S. at 1004. Unlike *Blum*, where the completion of a patient assessment form was a state mandate, the FAC does not allege the LLC had to satisfy state-mandated administrative requirements prior to termination. Indeed, all the FAC alleges as to state action is that: (1) "Defendant Commission alone or in conjunction with its operating arm, the LLC . . . fell within the definition of a state actor pursuant to 42 U.S.C. Section 1983," **Doc. 5 at ¶ 11**, and (2) "the Commission and LLC . . . terminate[d], constructively discharge[d], harass[ed] and den[ied] promotion to Plaintiffs," *id.* **at ¶ 109**. Accordingly, the Court finds the FAC fails to allege a nexus between the LLC and the state.

Next, the LLC's decision to terminate Plaintiffs was not state action under the joint action test because there is no indication the LLC and the state worked together to cause the alleged deprivation. *Gallagher*, 49 F. 3d at 1453. To demonstrate state officials and private parties acted together, Plaintiffs cannot merely establish that the state acquiesced in the private conduct. To be clear, the FAC does not even allege the State (technically, States) even knew of Plaintiffs' termination. If the States were unaware of Plaintiffs' termination, it follows that the States could not have acquiesced to it—let alone have acted jointly with the LLC to deprive them of any constitutional right. Accordingly, the Court finds that the FAC does not allege facts sufficient to show the States and the LLC acted together.

---

[22] Termination overstates what occurred, as alleged in the FAC. Plaintiff Goodwin voluntarily absconded from work and Plaintiff Keenan-Coniglio was placed on administrative leave (but did not seek re-employment). It's true that both Plaintiffs Bond and Hutson were terminated—albeit for timecard fraud.

Next, the LLC's decision to terminate Plaintiffs is not state action under the public function test because terminating employment is not "power[] traditionally exclusively reserved to the State."[23] *Gallagher*, 49 F.3d at 1456. As stated earlier, a private entity's conduct is not converted to state action simply because the state regulates the entity or provides significant financial support. Outside of conclusory allegations (**Doc. 5 at ¶¶ 11 & 109**), Plaintiffs do not allege that the LLC is connected to the States. Instead, Plaintiffs argue the Commission is connected to the States— and because the LLC runs the day-to-day operations, that means the LLC is connected to the Commission which is connected to the States. But this is too attenuated. Hiring and firing decisions at the LLC are different in kind from the States' actions of establishing and funding the Commission.

Lastly, the Cumbres Defendants' decision to terminate Plaintiffs is also not state action under the symbiotic relationship test. Again, there is no indication the States were involved in the hiring and firing decisions at the railroad—outside of the four Commissioners appointed to the Commission. And this involvement at the Commission does not equate to joint participation in operating the LLC. But even extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not establish a symbiotic relationship. *Gallagher*, 49 F.3d at 1451. Accordingly, the Court concludes the FAC fails to demonstrate state action— providing another justification for dismissal of Count VI.

---

[23] A few other examples come to mind, too. In *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982), a state-funded and state-regulated private school terminated employees for speaking against the administration's policies. In that case, the Supreme Court held there was no state action "with respect to decisions involving the discharge of personnel." *Id.* at 836. The same is true here.

Likewise, in *MacDonald v. E. Wyo. Mental Health Ctr.*, 941 F.2d 1115 (10th Cir. 1991), the Tenth Circuit found there was no state action because Plaintiffs "presented no evidence tending to prove that the state was involved in the [private corporation's] decision to discharge them," and "[a]bsent any showing that the state directed, controlled, or influenced this particular personnel decision," there was not a viable §1983 claim. *Id.* at 1118.

* * *

In summary, the FAC does not sufficiently plead state action on the part of the Cumbres Defendants. Thus, Count VI must be dismissed under Rule 12(b)(6).

### C. Arm of the state and immunity analysis

Dismissal is also appropriate under Rule 12(b)(1), though—under the arm of the state doctrine. This doctrine "bestows immunity on entities created by state governments that operate as alter egos or instrumentalities of the states." *Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 574 (10th Cir. 1996). If the LLC is an alter ego of the Commission, as alleged by Plaintiffs (**Doc. 43 at 1**), then both entities are arms of the States.

The Court now turns to the two-step arm of the state framework. *See Hennessey v. Univ. of Kan. Hosp. Auth.*, 53 F.4th 516, 528 (10th Cir. 2022) (applying a two-step process for "assessing whether an entity is an arm of the state"). Step one has four subfactors, which are analyzed below. *See id.* (citing *Steadfast Ins. Co. v. Agric. Ins. Co.*, 507 F.3d 1250, 1253 (10th Cir. 2007)).

First, the Court assesses the character ascribed to the entity under state law. Cumbres Toltec Operating, LLC, is a wholly owned subsidiary of the Cumbres & Toltec Railroad Commission. And the Commission as an interstate agency.[24] Thus, both States' laws expressly identify the railroad Commission as an agency.

Second, the Court considers the autonomy accorded the entity under state law. The Commissioners are appointed by the States' Governors. C.R.S. § 24-60-1903. And they "serve for the [States]." NMSA 1978 §§ 16-5-3 & 16-5-4. That being said, the Commission's "employees

---

[24] Colorado law defines this entity as "an interstate agency known as the Cumbres and Toltec scenic railroad commission." C.R.S. § 24-60-1902. New Mexico law says the same; explaining the "Cumbres and Toltec scenic railroad commission" is "an interstate agency." NMSA 1978 § 16-5-3.

are not officers and employees of either of the states." C.R.S. § 24-60-1902. (New Mexico law is silent on this point).

Third, the Court studies the finances. Here, the Commission is funded by the States. The "expenses and compensation" are paid "out of funds appropriated by the general assembly." C.R.S. § 24-60-1904; NMSA 1978 § 16-5-5. Both States also place restrictions on the Commission's handling of finances. C.R.S. § 24-60-1906; NMSA 1978 § 16-5-9. And the States provide significant appropriations. *See* **Doc. 15-4**; *see also* **Doc. 43-1**. The Commission is subject to various auditing and reporting requirements. *See* **Doc. 15 at 2** (citing **Doc. 15-4**); **Doc. 43 at 5–6** (citing **Doc. 43-1**).

Fourth, this Court asks whether the entity in question is concerned primarily with local or state affairs. This requires an examination of the agency's function, composition, and purpose. Colorado and New Mexico—by and through Congress—entered into this compact to establish a "scenic railroad running between those States, as a living museum." **Doc. 24-2**. The railroad's geographical[25] scope, in tandem with its conservation function, suggests the agency was designed to fulfill a State (not local) purpose. The Commission's composition also indicates that it is an arm of the States—giving its political appointment process. To be candid, though, the fact employees are not statutorily designated as state employees cuts against an arm of the state finding.

Each of these factors generally "point in the same direction." *Good*, 121 F.4th at 792. Thus, the analysis could end with a finding that the Commission is an agency of the States. *Id.* Out of an abundance of caution (and in light of the lacking employee designation), the Court moves onto *Hennessey*'s second step. Here, the Court considers "the 'twin reasons' underlying the Eleventh Amendment." *Hennessey*, 53 F.4th at 528. The most important reason for sovereign immunity is,

---

[25] The rail runs sixty-four miles in length—making it the "longest" and "highest" steam railroad in North America. *See* https://cumbrestoltec.com/.

of course, "avoiding state liability for any judgment against the entity." *Good*, 121 F.4th at 793 (quoting *id.* (quoting *United States ex rel. Sikkenga v. Regence Bluecross Blueshield*, 472 F.3d 702, 718 (10th Cir. 2006))). Here, the States agree to bear responsibility for liabilities incurred by the Commission. *See* **Doc. 16-1 at 10–11, Art. VI**. The States agreed to share liability—and their respective treasuries would pay the judgment. This is dispositive. *See Hess v. Port Auth. Trans-Hudson Corp.*, 513 U.S. 30, 49 (1994). This case involves a "thinly capitalized railroad that depends for its existence on a state-provided 'financial safety net . . . .'" *Id.* (first citing *Alaska Cargo Transp., Inc. v. Alaska R.R. Corp.*, 5 F.3d 378 (9th Cir. 1993) and then citing *Morris v. Wash. Metro. Area Transit Auth.*, 781 F.2d 218 (D.C. Cir. 1986)).

Therefore, after reviewing the factors as they apply to the Commission, the Court finds this bi-state agency should be characterized as a branch of the States, rather than as a local or municipal agency. In so concluding, the Court finds significant the amount of control which the States wield over the composition of the Commission (**Doc. 16-1 at 13–14**), the fact they jointly hold title to all railroad property (***id.* at 5**), and profit/loss sharing (***id.* at 6, 11, 12**). As such, Eleventh Amendment immunity is properly accorded to this arm of the States.

\* \* \*

Alternatively, the Cumbres Defendants are not "persons" to whom § 1983 applies (**Doc. 15 at 21**). *See Hartman v. Kickapoo Tribe Gaming Comm'n*, 319 F.3d 1230, 1234 (10th Cir. 2003) ("[N]either a state nor a state agency is a 'person' for purposes of § 1983."); *see also Thomas v. Knutson*, 2024 U.S. App. LEXIS 11298, at \*8 (10th Cir. May 9, 2024) (unpublished) ("It has long been established states, state agencies, and state officials acting in their official capacities are not 'persons' under § 1983."). This means neither the Commission nor LLC may be sued under § 1983. *See Harper v. Colo. State Bd. of Land Comm'rs*, 248 F. App'x 4, 9 (10th Cir. 2007) (unpublished);

*Smith v. Birdsall*, 68 F. App'x 176, 177 (10th Cir. 2003) (unpublished) (affirming district court's dismissal of § 1983 complaint against "state agencies" and "interstate compacts"); *see also James v. Wash. Metro. Area Transit Auth.*, 649 F. Supp. 2d 424, 429 (D. Md. 2009) (determining "an interstate compact agency . . . shares in the Eleventh Amendment sovereign immunity of its signatory states" (citing *Lizzi v. Alexander*, 255 F.3d 128, 132 (4th Cir. 2001))).

Such a finding also supports dismissal of Count VI.

## IV. Section 1983 (Individual Defendants) — Count V

Finally, given the above conclusions of law, it should come as little surprise that the Court also dismisses Count V. Plaintiffs sued three supervisors at the LLC and one Commissioner, in their individual capacities, under § 1983.[26] *See* **Doc. 5 at ¶¶ 9, 10, 101–07**. But these people were not state actors.[27] They did not "represent [the state] in some capacity." *Gallagher*, 49 F.3d at 1447. And "private conduct that is not 'fairly attributable' to the State is simply not actionable under § 1983." *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995).

### CONCLUSION

As explained above, the Cumbres Defendants' Motion to Dismiss (**Doc. 15**) is **GRANTED in part** and **DENIED in part**. Specifically, Plaintiffs' claims in Count I, III, IV, and VI are **DISMISSED with prejudice**. The Court also **DISMISSES** Count II—with respect to Plaintiffs Bond, Goodwin, and Hutson—**with prejudice**. Plaintiff Keenan-Coniglio's Title VII claim in

---

[26] Although not determinative, the Court notes some factual allegations fall outside the statute of limitations period. *See Herrera v. City of Espanola*, 32 F.4th 980, 989 (10th Cir. 2022) (noting that "for § 1983 claims arising in New Mexico the limitations period is three years"). Some of the facts alleged by Plaintiffs Bond, Goodwin, and Hutson date back to 2018 and 2019. *See* **Doc. 5 at ¶¶ 34, 44–45, 68–70**.

[27] Under Colorado law, the Commission's "employees are not officers and employees of either of the states." C.R.S. § 24-60-1902. Although New Mexico law is silent on this point, no statute says the commissioners are public employees.

Count II based on race is, likewise, **DISMISSED with prejudice**, but her gender/sex-based harassment and hostile work environment claim in Count II survives.

The Individual Defendants' Motion to Dismiss (**Doc. 16**) is also **GRANTED**, and Count V is **DISMISSED with prejudice**.

**IT IS SO ORDERED.**

/s/

_____
WILLIAM P. JOHNSON
SENIOR UNITED STATES DISTRICT JUDGE