**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**


LAUREL KEENAN-CONIGLIO,

      Plaintiffs,

vs.

CUMBRES & TOLTEC SCENIC OPERATING
COMMISSION, CUMBRES & TOLTEC
OPERATING, LLC,                    No.: 1:23-CV-01051-KG-JHR

      Defendants.

## DEFENDANTS CUMBRES & TOLTEC RAILROAD COMMISSION AND CUMBRES TOLTEC OPERATING, LLC'S PARTIAL MOTION TO DISMISS

Defendants Cumbres Toltec Operating, LLC (incorrectly named as "Cumbres & Toltec Operating, LLC"), through undersigned counsel, hereby submits its Partial Motion to Dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and, in support thereof, state as follows:

### I.    CONFERRAL

Counsel for the Parties conferred regarding this Motion on multiple occasions pursuant to D.N.M.LR-CIV 7.1(a). Plaintiff opposes the relief requested herein.

### II.    INTRODUCTION

Plaintiff is a former employee of Cumbres & Toltec Operating, LLC ("CTO"), a subsidiary wholly owned by Defendant Cumbres & Toltec Railroad Commission (the "Commission"). The CTO operates the Cumbres & Toltec Scenic Railroad on both the Colorado and New Mexico (the "States") portions of the tracks. Defendant Cumbres & Toltec Scenic Railroad  Commission (the

1

"Commission") is the CTO's governing body and oversees the management, administration, and operations of this historic railroad. As relevant to this Motion, Plaintiff's Second Amended Complaint alleges that CTO engaged in retaliatory employment practices against her and in doing so acted contrary to public policy, giving rise to Plaintiff's claim of retaliatory discharge (Count VII).

Perhaps the most obvious problem with the Second Amended Complaint ("SAC") ([Dkt. #72]) is Plaintiff's attempt to relitigate issues already addressed by the Court. These previously established obstacles, as outlined by the Court's previous Memorandum Opinion and Order re: Entity's MTD ("Order on MTD") ([Dkt. #52]), prove fatal to the Plaintiff's newest claim for retaliatory discharge, cause of action to which government entities are typically immune. Additionally, the Court lacks jurisdiction to consider Count VII against the CTO, as doing so would violate the Contracts Clause of the U.S. Constitution. Jurisdiction aside, Plaintiff also cannot state a plausible wrongful discharge retaliation claim under New Mexico or Colorado law and ultimately fails to state any materially adverse action suffered that would give rise to such a claim. Finally, Plaintiff also ignores Colorado law[1], which bars retaliatory discharge claims where another adequate statutory remedy is available. Plaintiff's claimed sources of public policy underpinning her retaliatory discharge claim all provide adequate alternative remedies.

For these reasons, the Court should thereby dismiss this claim.

### III.    BACKGROUND

Originally constructed in 1880 as a portion of the Rio Grande's narrow gauge San Juan

---

[1] Although Plaintiff purports to bring this claim under New Mexico law (*see* Dkt. #63-1, ¶ 119), Colorado should be applied to such a claim based on New Mexico's conflict of law rules and the factual realities of Plaintiff's allegations, discussed further below.

Extension, today the states of Colorado and New Mexico own and operate the Cumbres and Toltec Scenic Railroad ("the Railroad"). The Railroad travels between Chama, New Mexico and Antonito, Colorado. This "Museum on Wheels" traverses the Colorado/New Mexico border eleven times and climbs to an altitude of 10,015 feet during its 64 miles of track. The Railroad became a designated National Historic Landmark in 2012.

The Railroad's status as a legal entity is more complicated. After purchasing the Railroad through a provisional agreement in 1970, the States sought an interstate compact in order to jointly restore and operate the Railroad. Congress blessed that union through its ratification of the Cumbres & Toltec Scenic Railroad Compact (the "Compact") in 1974 under power granted by Article I, Section 10, clause 3 (the "Compact Clause") of the United States Constitution, which prohibits any state from entering into certain agreements with another state without the consent of the U.S. Congress. *United U. S. Steel Corp. v. Multistate Tax Comm'n*, 434 U.S. 452, 468 (1978). This prohibition prevents increased power to one state that may "encroach" upon the supremacy of the United States. *Id.* Implying that supremacy over the states is the exclusive province of the federal government. Interstate power is also limited to the reciprocal powers granted by the compact states unanimously under Article I, Section 10, clause 1 (the "Contracts Clause") of the United States Constitution. *See State ex rel. State Eng'r v. United States*, 2018-NMCA-053, ¶ 13, 425 P.3d 723, 730 ("[A] compact between interstate authorities may not be impaired by the participating states once approved by Congress.") *citing Kansas v. Nebraska*, 574 U.S. 445 (2015).

Among other terms, the Compact allows the States to operate the Railroad and to make such agreements as necessary to carry out the purpose of the Compact. *See generally*, Cumbres and Toltec Scenic Railroad Compact, Pub. L. No. 93-467, 88 Stat. 1421 (1974). By 1977, the

States ratified the Compact and, in parallel legislation, passed enabling statutes to form the Commission. *See* C.R.S. § 24-60-1901, 1701; N.M.S.A. 1978, § 16-5-2, 16-5-3.

In 1977, the States amended the 1970 Agreement to provide more a more thorough framework for the ownership, governance, cooperation, and operation of the Railroad ("1977 Amendment"). *See generally*, 1977 Amendment, ([Dkt. #15-1]). The 1977 Amendment describes the nature of the Commission as an interstate agency, discussed further below. The governors for the States executed a Memorandum of Understanding ("2006 MOU") in 2006 to "reorganize the Commission as a professionally qualified governing body[.]" *See* Recitals ([Dkt. #15-2] at 1). The 2006 MOU required the appointment of new Commissioners possessing at least five years of experience overseeing a major business enterprise such that the "Commission shall serve an oversight role on the model of a board of directors to a corporation." *See* id. at 2. Additionally, both States promised to provide a marketing liaison to the Commission and to direct each State's Department of Transportation to provide expertise and resources to the Commission as necessary. Id.

In 2012, the Commission – reorganized to operate as a board of directors – formed the CTO, a wholly owned subsidiary, for the purposes of operating the Railroad in lieu of contracting with independent operators. The Commission members serve as the CTO's Board of Directors and govern the CTO as an extension of the Railroad, as contemplated under the 2006 MOU. The Commission, which retains all responsibility for policy and governance, is the only member of the CTO; therefore, the CTO is, effectively, the Commission. *See generally*, Operating Agreement ([Dkt. #15-3]).

## IV.   ALLEGATIONS

Plaintiff is a former employee of the CTO. *See* SAC, ¶ 1. According to her allegations (¶¶ 20-35), Plaintiff first became employed by the CTO sometime during the 2021 Operating Season for the position of Parlor Car Attendant. Id., ¶ 20. Plaintiff admits she initially desired a position in operations. Id. Through a series of events largely irrelevant to her claims, Plaintiff succeeded in securing a position on the Fire Patrol during the 2021 Operating Season. Id., ¶ 21. Plaintiff alleges she experienced harassment and eventually reported unspecified "discriminatory practices" on July 13, 2022, before leaving for a scheduled vacation of unspecified duration. Id., ¶ 28. After receiving her complaint, the Railroad commissioned a third-party investigation of her allegations. Id., ¶ 29. After an interview on August 9, 2022, Plaintiff reviewed a written statement of her interview. Id. Plaintiff does not allege that she ever objected to this documentation or informed the Railroad that she believed the investigation was incomplete. Instead, she alleges that the Railroad "depriv[ed] her of work and advancement opportunities" by placing her on administrative leave of an unspecified duration. Id. On the last day of the 2022 operating season, October 23, 2022, Plaintiff alleges she learned the results of the third-party investigation through the Railroad's human resources personnel. Id., ¶ 30. Plaintiff does not allege that she ever re-applied or sought re-employment with the Railroad. Plaintiff alleges that, in opposing discrimination against herself and her co-workers, she "engaged in activities that public policy encourages or refrained from actions that public policy discourages, or both" and goes on to generally list various state and federal policies and acts. Id., ¶ 35. Notably, the SAC does not allege that Plaintiff ever complained about unsafe working conditions or that she was ever ordered to engage in unsafe working conditions.

### V.   STANDARDS OF REVIEW

#### A.   STANDARD OF REVIEW UNDER FED. R. CIV. P. 12(B)(1)

"Federal courts are courts of limited jurisdiction." *McKinnon v. United States*, No. CV 99-657 SC/WWD ACE, 2000 WL 36739951, at *3 (D.N.M. Mar. 9, 2000). When subject matter jurisdiction is based on a federal question, "jurisdiction must appear on the face of the complaint and the complaint must identify the statutory or constitutional provision under which the claim arises, and allege sufficient facts to show that the case is one arising under federal law." *Sac & Fox Nation of Oklahoma v. Cuomo*, 193 F.3d 1162, 1165-66 (10th Cir. 1999) (internal alterations and quotations omitted).

"When, as here, a Rule 12(b)(1) motion goes beyond the allegations in the complaint and challenges the facts upon which subject matter jurisdiction depends, a district court may allow affidavits and other evidentiary material outside the pleadings and does not presume that the factual allegations in the complaint are true." *Myles v. United States*, 52 F. App'x 108, 109 (10th Cir. 2002).

#### B.   STANDARD OF REVIEW UNDER FED. R. CIV. P. 12(B)(6)

"To survive a motion to dismiss [under 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). When evaluating a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court must "accept as true all well-pleaded factual allegations . . . and view these allegations in the light most favorable to plaintiff." *Casanova v. Ulibarri*, 595 F.3d 1120, 1124 (10th Cir. 2010) (quoting *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)). However, a plaintiff may not rely on mere labels or conclusions, "and a

formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

### VI.    ARGUMENT

**A.    Plaintiff cannot overcome the sovereign immunity of the defendants in her tort claim.**

The Court in this matter has already ruled that the CTO enjoys sovereign immunity as an arm of the state. This decision was based on the fact that CTO, the alleged alter-ego for C&TS RR, enjoys sovereign immunity as an arm of the states of Colorado and New Mexico and the tort claim of retaliation is thereby blocked. Order on MTD, at 34-36 (finding that "[d]ismissal [based on immunity of state governmental entities] is also appropriate under Rule 12(b)(1)"). The Defendants' sovereign immunity extends beyond traditional Eleventh Amendment analysis due to their unique status as interstate compact entities created with express congressional approval. *See Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979) (holding that where good reason to believe the States structured the agency to "enjoy the special constitutional protection of the States themselves" then justification exists for extending immunity unto the interstate entity created). Further, because of sovereign immunity, courts in both Colorado and New Mexico have rejected retaliatory discharge claims against government entities where the state has not waived immunity. *See Gramm v. Kit Carson Cnty. Health Servs. Dist.*, No. 20CA0299, 2021 WL 12346989, at *4 (Colo. App. June 10, 2021) (unpublished); *Silva v. Town of Springer*, 912 P.2d 304, 311 (N.M. Ct. App. 1996).

Plaintiff has not provided any new facts or argument surrounding jurisdiction or immunity in the SAC that stand apart from the First Amended Complaint, and courts have rejected retaliatory discharge claims against governmental entities on immunity grounds under Colorado and New

Mexico law, which is also the case here. *See, e.g., Holland v. Bd. of Cnty. Comm'rs of Cnty. of Douglas*, 883 P.2d 500, 508 (Colo. App. 1994) (no exception for retaliatory discharge under the Colorado Governmental Immunity Act); *Vargas v. Pub. Educ. Dep't*, No. 121CV00600DHUJHR, 2024 WL 1051319, at *4 (D.N.M. Mar. 11, 2024) (common law retaliatory discharge is a tort and is not waived under the New Mexico Tort Claims Act). The 1974 interstate compact establishing the Commission received specific congressional consent, creating a federal-state partnership that enhances rather than diminishes immunity protections. Order on MTD, at 36. Based on the Court's previous findings, that Eleventh Amendment immunity is afforded to the Commission and CTO as arms of the States, tort claims brought in this matter against either entity cannot stand.

**B.      Plaintiff nevertheless does not allege a plausible wrongful discharge claim.**

1.      <u>Plaintiff was not discharged from her employment.</u>

The SAC attempts to relitigate the Court's March 4, 2025, dismissal order by alleging that CTO's alleged retaliation "was a cause of harm against her" and that CTO "discharge[ed] her from employment and refrain[ed] from reemploying her." (Doc. 72, ¶ 115-16.). However, the Court previously concluded that Plaintiff's factual allegations do not bear this out. (Doc. 52 at 23).

To state a claim for wrongful discharge under Colorado law, Plaintiff must allege that:

(1) the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege;

(2) the action directed by the employer would violate a specific statute related to public health, safety, or welfare, or would undermine a clearly expressed policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker;

(3) **<u>the employee was terminated as the result</u>** of refusing to perform the act directed by the employer; and

(4) the employer was aware that the employee's refusal to perform the act was based on the employee's reasonable belief that the directed act was unlawful.

*Bonidy v. Vail Valley Ctr. for Aesthetic Dentistry, P.C.*, 232 P.3d 277, 281 (Colo. App. 2010) (emphasis added).

An actual discharge happens "when the employer uses language or engages in conduct that 'would logically lead a prudent person to believe [her] tenure has been terminated.'" *Potts v. Gaia Child., LLC*, 2024 COA 58, ¶ 19, 555 P.3d 82, 87, reh'g denied (June 20, 2024) (alteration in original).

> To prove constructive discharge, a plaintiff must establish deliberate action on the part of an employer that makes or allows an employee's working conditions to become so difficult or intolerable that the employee has no other choice but to resign…. Employees cannot simply "quit and sue," claiming they were constructively discharged.

*Id.* at 88-89.

Under either of these theories, Plaintiff does not plausibly allege that CTO discharged her. As the Court has already ruled, the end of seasonal employment is not a materially adverse action. (Doc. 52 at 23). And yet, Plaintiff now proposes to inflate acts that are not even materially adverse into an actual or constructive discharge.

Moreover, the 10th Circuit has previously, and explicitly, rejected the notion that consideration of adverse employment action short of termination from employment may be permitted when evaluating wrongful discharge actions based on the alleged violation of public policy. *See Freeman v. United Airlines*, 52 F. App'x 95, 102-03 (10th Cir. 2002) (declining to apply the broader "adverse employment action" standard in cases brought alleging wrongful discharge actions based on violations of public policy).

9

Notably absent from the Plaintiff's recounting of events in the SAC is evidence that CTO terminated her employment, but instead only alleges that she did not receive an offer to return to work in 2023. SAC ¶ 30. In its Order on MTD, the Court previously held that the ending of Plaintiff's seasonal employment was "not causally connected to any protected activity" and that the "end of seasonal employment 'is not a materially adverse action.'" [Doc. 52], at 23. Therefore, Plaintiff's argument for her claim here falls well outside both the technical as well as any discretionary application for a prima facie case and must be dismissed on these grounds alone.

   2.   Plaintiff's retaliatory discharge claim fails under Colorado law.

In Colorado[2], a wrongful discharge claim is unavailable when a plaintiff 's articulation of a public policy basis for the claim is predicated upon a statute that already provides a wrongful discharge remedy. *Gamble v. Levitz Furniture Co. of the Midwest Inc.*, 759 P.2d 761, 766 (Colo. App. 1988). Courts have applied this principle to nearly all of the statutes Plaintiff invokes in the Second Amended Complaint. *Stout v. Gyrodata, Inc.*, 560 F. App'x 765, 766-67 (10th Cir. 2014) (OSHA); *Ybarra v. Comprehensive Software Sys., LLC*, No. 18-CV-01679-NYW, 2019 WL 266310, at *8 (D. Colo. Jan. 19, 2019) (Title VII/CADA); *Caspar v. Lucent Techs., Inc.*, 280 F. Supp. 2d 1246, 1249 (D. Colo. 2003) (Title VII); *Spagnolia v. Charter Commc'ns, LLC*, No. 21-

---

[2] Although Plaintiff alleges her claim under New Mexico law, Colorado law should be applied to a claim for wrongful discharge. New Mexico conflict of law rules asserts the following principle:

> Although no New Mexico court has determined whether an employment discrimination claim arises where the allegedly discriminatory employment decision is made … if the Plaintiffs suffered harm in New Mexico, then New Mexico would apply its own laws. Otherwise, New Mexico would not apply its own law.

*Kennicott v. Sandia Corp.*, 314 F. Supp. 3d 1142, 1171 (D.N.M. 2018). Plaintiff worked in Antonito, Colorado at the time of the alleged events. Further, she pursued administrative remedies under the Colorado Anti-Discrimination Act, not the New Mexico Human Rights Act, when she filed her Charge of Discrimination with the Colorado Civil Rights Division.

CV-01787-KLM, 2023 WL 3317781, at *11 (D. Colo. May 5, 2023), *aff'd*, No. 23-1190, 2024 WL 3271816 (10th Cir. July 2, 2024) (CADA). Plaintiff vaguely states that her conduct was encouraged by public policies, "includ[ing] [but] not limited to" and lists a number of broadly encompassing statutes and regulations many of which already provide wrongful discharge remedies. SAC ¶ 10. As see above, none of these statutes will support a wrongful discharge claim under Colorado law without some other articulated public policy.

A similar conclusion results when applied to the Federal Railroad Safety Act ("FRSA") because "[t]he Act provides as remedies 'all relief necessary to make the employee whole," including reinstatement, back wages with interest, and compensatory and punitive damages;" for whistleblower retaliation. *BNSF R. Co. v. U.S. Dep't of Lab.*, 816 F.3d 628, 638 (10th Cir. 2016). The New Mexico Human Rights Act also provides the "fulsome" remedies that Plaintiff now seeks. *See Behrman v. Phototron Corp.*, 1990-NMSC-073, ¶ 24, 795 P.2d 1015, 1020 (finding that the NM HRA allows for compensatory damages, punitive damages, and attorney's fees).

Therefore, even if CTO were not immune (which it is) and even if Plaintiff plausibly alleged an actual or constructive discharge (which she has not), her retaliatory discharge claim still fails under this analysis as well.

## VII. CONCLUSION

Not only does Plaintiff's SAC ignore the impact of the Court's previous rulings in this matter, but it also fails for its own independent reasons. In addition to bringing a claim for retaliation against an entity that is immune from such action, Plaintiff fails to demonstrate that the employment action she suffered was in fact materially adverse and not consistent within the CTO's established and legal practice.

Therefore, for the myriad reasons above, the Court should dismiss Count VII listed in the Second Amended Complaint.

WHEREFORE, based on the foregoing, the Railroad respectfully requests that the Court dismiss Count VII listed in the Second Amended Complaint and that it grant any other relief deemed appropriate.

DATED this the 27th day of July 2026.

Respectfully submitted:

By:   /s/ Christopher R. Jones
Christopher R. Jones, #152060
Hannah Engle, #55301
GORDON REES SCULLY MANSUKHANI, LLP
555 Seventeenth St., Suite 3400
Denver, CO 80202
T: (303) 534-5160
F: (303) 534-5161
crjones@grsm.com
hengle@grsm.com
*Attorneys for Defendants*

12

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing document was served through the Court's e-filing system upon all counsel this the 27th day of July 2026.


/s/ *Christopher R. Jones*
Christopher R. Jones